# STEAGALD *v.* UNITED STATES

No. 79–6777. Argued January 14, 1981—Decided April 21, 1981

MARSHALL, J., delivered the opinion of the Court, in which BRENNAN, STEWART, BLACKMUN, POWELL, and STEVENS, JJ., joined. BURGER, C. J., concurred in the judgment. REHNQUIST, J., filed a dissenting opinion, in which WHITE, J., joined, *post,* p. 223.

*John Richard Young,* by appointment of the Court, 449 U. S. 948, argued the cause and filed a brief for petitioner.

*Deputy Solicitor General Frey* argued the cause for the United States. With him on the brief were *Solicitor General McCree, Assistant Attorney General Heymann, Peter Buscemi, Elliott Schulder, William G. Otis,* and *Patty Merkamp Stemler.**

JUSTICE MARSHALL delivered the opinion of the Court.

The issue in this case is whether, under the Fourth Amendment, a law enforcement officer may legally search for the subject of an arrest warrant in the home of a third party without first obtaining a search warrant. Concluding that a search warrant must be obtained absent exigent circum-

---

**John McNally* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

stances or consent, we reverse the judgment of the United States Court of Appeals for the Fifth Circuit affirming petitioner's conviction.

I

In early January 1978, an agent of the Drug Enforcement Administration (DEA) was contacted in Detroit, Mich., by a confidential informant who suggested that he might be able to locate Ricky Lyons, a federal fugitive wanted on drug charges. On January 14, 1978, the informant called the agent again, and gave him a telephone number in the Atlanta, Ga., area where, according to the informant, Ricky Lyons could be reached during the next 24 hours. On January 16, 1978, the agent called fellow DEA Agent Kelly Goodowens in Atlanta and relayed the information he had obtained from the informant. Goodowens contacted Southern Bell Telephone Co., and secured the address corresponding to the telephone number obtained by the informant. Goodowens also discovered that Lyons was the subject of a 6-month-old arrest warrant.

Two days later, Goodowens and 11 other officers drove to the address supplied by the telephone company to search for Lyons. The officers observed two men standing outside the house to be searched. These men were Hoyt Gaultney and petitioner Gary Steagald. The officers approached with guns drawn, frisked both men, and, after demanding identification, determined that neither man was Lyons. Several agents proceeded to the house. Gaultney's wife answered the door, and informed the agents that she was alone in the house. She was told to place her hands against the wall and was guarded in that position while one agent searched the house. Ricky Lyons was not found, but during the search of the house the agent observed what he believed to be cocaine. Upon being informed of this discovery, Agent Goodowens sent an officer to obtain a search warrant and in the meantime conducted a second search of the house, which uncovered

additional incriminating evidence. During a third search conducted pursuant to a search warrant, the agents uncovered 43 pounds of cocaine. Petitioner was arrested and indicted on federal drug charges.

Prior to trial, petitioner moved to suppress all evidence uncovered during the various searches on the ground that it was illegally obtained because the agents had failed to secure a search warrant before entering the house. Agent Goodowens testified at the suppression hearing that there had been no "physical hinderance" preventing him from obtaining a search warrant and that he did not do so because he believed that the arrest warrant for Ricky Lyons was sufficient to justify the entry and search. The District Court agreed with this view, and denied the suppression motion. Petitioner was convicted, and renewed his challenge to the search in his appeal. A divided Court of Appeals for the Fifth Circuit affirmed the District Court's denial of petitioner's suppression motion. *United States* v. *Gaultney,* 606 F. 2d 540 (1979).[1] Because the issue presented by this case is an important one[2] that has divided the Circuits,[3] we granted certiorari. 449 U. S. 819.

---

[1] The court relied on a previous decision in the Circuit that held that "when an officer holds a valid arrest warrant and reasonably believes that its subject is within premises belonging to a third party, he need not obtain a search warrant to enter for the purpose of arresting the subject." *United States* v. *Cravero,* 545 F. 2d 406, 421 (1976), cert. denied, 430 U. S. 983 (1977). Circuit Judge Kravitch dissented on the ground that the information known to the agents was insufficient to establish a reasonable belief that Lyons could be found in the house to be searched. 606 F. 2d, at 548. On the petition for rehearing, Judge Kravitch, again in dissent, contended that the majority's decision announced a "rule of questionable validity and wisdom" and represented a "disturbing erosion of the Fourth Amendment rights of third parties." *United States* v. *Gaultney,* 615 F. 2d 642, 644 (1980).

[2] Last Term we noted that this question remained unresolved. See *Payton* v. *New York,* 445 U. S. 573, 583 (1980).

[3] Three Circuits have held that in the absence of exigent circumstances a search warrant is required before law officers may enter the home of

## II

The Government initially seeks to avert our consideration of the Fifth Circuit's decision by suggesting that petitioner may, regardless of the merits of that decision, lack an expectation of privacy in the house sufficient to prevail on his Fourth Amendment claim. This argument was never raised by the Government in the courts below. Moreover, in its brief in opposition to certiorari the Government represented

a third party to execute an arrest warrant. See *Government of Virgin Islands* v. *Gereau*, 502 F. 2d 914, 928 (CA3 1974), cert. denied, 420 U. S. 909 (1975); *Wallace* v. *King*, 626 F. 2d 1157, 1158–1159 (CA4 1980), cert. pending, No. 80–503; *United States* v. *Prescott*, 581 F. 2d 1343, 1347–1350 (CA9 1978). Two Circuits have joined the Court of Appeals in this case in adopting the contrary view that a search warrant is not required in such situations if the police have an arrest warrant and reason to believe that the person to be arrested is within the home to be searched. See *United States* v. *McKinney*, 379 F. 2d 259, 262–263 (CA6 1967); *United States* v. *Harper*, 550 F. 2d 610, 612–614 (CA10), cert. denied, 434 U. S. 837 (1977). The Second Circuit has suggested in dictum that it subscribes to this latter view, see *United States* v. *Manley*, 632 F. 2d 978, 983 (1980), while the Court of Appeals for the District of Columbia Circuit has recently indicated that it would require a search warrant in such cases. See *United States* v. *Ford*, 180 U. S. App. D. C. 1, 14, n. 45, 553 F. 2d 146, 159, n. 45 (1977). Two other Courts of Appeals have left the issue open. See *United States* v. *Adams*, 621 F. 2d 41, 44, n. 7 (CA1 1980); *Rice* v. *Wolff*, 513 F. 2d .1280, 1291–1292, and n. 7 (CA8 1975), rev'd on other grounds *sub nom. Stone* v. *Powell*, 428 U. S. 465 (1976). The Seventh Circuit has not considered the question.

While the courts are in conflict, most modern commentators agree that a search warrant is necessary to fully protect the privacy interests of third parties when their home is searched for the subject of an arrest warrant. See 2 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment 374, 384–385 (1978); Rotenberg & Tanzer, Searching for the Person to Be Seized, 35 Ohio St. L. J. 56, 67–71 (1974); Groot, Arrests in Private Dwellings, 67 Va. L. Rev. 275 (1981); Note, The Neglected Fourth Amendment Problem in Arrest Entries, 23 Stan. L. Rev. 995, 997–999 (1971); Comment, Arresting a Suspect in a Third Party's Home: What is Reasonable?, 72 J. Crim. L. & C. 293 (1981). But see Mascolo, Arrest Warrants and Search Warrants: The Seizure of A Suspect in the Home of a Third Party, 54 Conn. Bar J. 299 (1980).

to this Court that the house in question was "petitioner's residence" and was "occupied by petitioner, Gaultney, and Gaultney's wife." Brief in Opposition 1, 3. However, the Government now contends that the record does not clearly show that petitioner had a reasonable expectation of privacy in the house, and hence urges us to remand the case to the District Court for re-examination of this factual question.

We decline to follow the suggested disposition. Aside from arguing that a search warrant was not constitutionally required, the Government was initially entitled to defend against petitioner's charge of an unlawful search by asserting that petitioner lacked a reasonable expectation of privacy in the searched home, or that he consented to the search, or that exigent circumstances justified the entry. The Government, however, may lose its right to raise factual issues of this sort before this Court when it has made contrary assertions in the courts below, when it has acquiesced in contrary findings by those courts, or when it has failed to raise such questions in a timely fashion during the litigation.

We conclude that this is such a case. The Magistrate's report on petitioner's suppression motion, which was adopted by the District Court, characterized the issue as whether an arrest warrant was sufficient to justify the search of "the home of a third person" for the subject of the warrant. App. 12. The Government never sought to correct this characterization on appeal, and instead acquiesced in the District Court's view of petitioner's Fourth Amendment claim. Moreover, during both the trial and the appeal in this case the Government argued successfully that petitioner's connection with the searched home was sufficient to establish his constructive possession of the cocaine found in a suitcase in the closet of the house.[4] Moreover, the Court of Appeals concluded, as

---

[4] The Court of Appeals, in accepting this contention, cited the Government's own evidence that several checks and papers bearing petitioner's name were found in the house and that "Steagald, when taken into cus-

had the Magistrate and the District Court, that petitioner's Fourth Amendment claim involved the type of warrant necessary to search "premises belonging to a third party." 606 F. 2d, at 544. Again, the Government declined to disturb this characterization. When petitioner sought review in this Court, the Government could have filed a cross-petition for certiorari suggesting, as it does now, that the case be remanded to the District Court for further proceedings. Instead, the Government argued that further review was unnecessary. Finally, the Government in its opposition to certiorari expressly represented that the searched home was petitioner's residence.

Thus, during the course of these proceedings the Government has directly sought to connect petitioner with the house, has acquiesced in statements by the courts below characterizing the search as one of petitioner's residence, and has made similar concessions of its own. Now, two years after petitioner's trial, the Government seeks to return the case to the District Court for a re-examination of this factual issue.[5]

---

tody, was wearing only slacks and a long-sleeve shirt, clothing inconsistent with the coldness of the January afternoon, and that once taken inside the . . . house, told a DEA agent that he was cold and requested that she get a sweater or coat for him from the kitchen area." 606 F. 2d, at 546–547.

[5] The Government asserts that it was unable to raise this issue in the courts below because both courts had acted before this Court decided *United States* v. *Salvucci*, 448 U. S. 83 (1980). We do not find this justification to be compelling. Under the "automatic standing" rule of *Jones* v. *United States*, 362 U. S. 257 (1960), any person charged with a possessory offense could challenge the search in which the incriminating evidence was obtained. *Salvucci* overruled *Jones* and instead limited such Fourth Amendment claims to those persons who had a reasonable expectation of privacy in the area or object of the search. Although *Salvucci* thus altered Fourth Amendment jurisprudence to some extent, the rationale of that decision was in large part simply an extension of this Court's earlier reasoning in *Rakas* v. *Illinois*, 439 U. S. 128 (1978). The *Rakas* decision held that an illegal search violated the Fourth Amendment rights only of those persons who had a "legitimate expectation of

The tactical advantages to the Government of this disposition are obvious, for if the Government prevailed on this claim upon a remand, it would be relieved of the task of defending the judgment of the Court of Appeals before this Court. We conclude, however, that the Government, through its assertions, concessions, and acquiescence, has lost its right to challenge petitioner's assertion that he possessed a legitimate expectation of privacy in the searched home. We therefore turn to the merits of petitioner's claim.

## III

The question before us is a narrow one.[6] The search at issue here took place in the absence of consent or exigent circumstances. Except in such special situations, we have consistently held that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant. See *Payton* v. *New*

---

privacy in the invaded place." *Id.*, at 143. While that decision did not directly address the "automatic standing" rule of *Jones* v. *United States*, it was clearly an ill omen for the continued vitality of that decision. Since *Rakas* was decided well before this case was briefed and argued in the Court of Appeals, the Government could easily have raised before that court the question of whether petitioner's Fourth Amendment rights were even implicated by the search at issue here. Indeed, the Government in *Salvucci* clearly recognized the significance of *Rakas*, for in that case, despite the contrary authority of *Jones* v. *United States*, it argued from the outset that the defendant lacked a sufficient expectation of privacy to challenge the legality of the search under the Fourth Amendment. We are given no explanation why the Government failed to regard *Rakas* as of equal significance to this case. In any event, *Salvucci* was decided before certiorari was sought in this case, but rather than oppose certiorari on the ground that petitioner lacked a legitimate expectation of privacy in the searched home, the Government made explicit concessions to the contrary.

[6] Initially, we assume without deciding that the information relayed to Agent Goodowens concerning the whereabouts of Ricky Lyons would have been sufficient to establish probable cause to believe that Lyons was at the house searched by the agents.

*York*, 445 U. S. 573 (1980); *Johnson* v. *United States*, 333 U. S. 10, 13–15 (1948). Thus, as we recently observed: "[I]n terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton* v. *New York, supra,* at 590. See *Coolidge* v. *New Hampshire,* 403 U. S. 443, 474–475, 477–478 (1971); *Jones* v. *United States,* 357 U. S. 493, 497–498 (1958); *Agnello* v. *United States,* 269 U. S. 20, 32–33 (1925). Here, of course, the agents had a warrant—one authorizing the arrest of Ricky Lyons. However, the Fourth Amendment claim here is not being raised by Ricky Lyons. Instead, the challenge to the search is asserted by a person not named in the warrant who was convicted on the basis of evidence uncovered during a search of his residence for Ricky Lyons. Thus, the narrow issue before us is whether an arrest warrant—as opposed to a search warrant—is adequate to protect the Fourth Amendment interests of persons not named in the warrant, when their homes are searched without their consent and in the absence of exigent circumstances.

The purpose of a warrant is to allow a neutral judicial officer to assess whether the police have probable cause to make an arrest or conduct a search. As we have often explained, the placement of this checkpoint between the Government and the citizen implicitly acknowledges that an "officer engaged in the often competitive enterprise of ferreting out crime," *Johnson* v. *United States, supra,* at 14, may lack sufficient objectivity to weigh correctly the strength of the evidence supporting the contemplated action against the individual's interests in protecting his own liberty and the privacy of his home. *Coolidge* v. *New Hampshire, supra,* at 449–451; *McDonald* v. *United States,* 335 U. S. 451, 455–456 (1948). However, while an arrest warrant and a search warrant both serve to subject the probable-cause determina-

tion of the police to judicial review, the interests protected by the two warrants differ. An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from an unreasonable seizure. A search warrant, in contrast, is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place, and therefore safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police.

Thus, whether the arrest warrant issued in this case adequately safeguarded the interests protected by the Fourth Amendment depends upon what the warrant authorized the agents to do. To be sure, the warrant embodied a judicial finding that there was probable cause to believe that Ricky Lyons had committed a felony, and the warrant therefore authorized the officers to seize Lyons. However, the agents sought to do more than use the warrant to arrest Lyons in a public place or in his home; instead, they relied on the warrant as legal authority to enter the home of a third person based on their belief that Ricky Lyons might be a guest there. Regardless of how reasonable this belief might have been, it was never subjected to the detached scrutiny of a judicial officer. Thus, while the warrant in this case may have protected Lyons from an unreasonable seizure, it did absolutely nothing to protect petitioner's privacy interest in being free from an unreasonable invasion and search of his home. Instead, petitioner's only protection from an illegal entry and search was the agent's personal determination of probable cause. In the absence of exigent circumstances, we have consistently held that such judicially untested determinations are not reliable enough to justify an entry into a person's home to arrest him without a warrant, or a search of a home for objects in the absence of a search warrant.

*Payton* v. *New York, supra; Johnson* v. *United States, supra.* We see no reason to depart from this settled course when the search of a home is for a person rather than an object.[7]

---

[7] Indeed, the plain wording of the Fourth Amendment admits of no exemption from the warrant requirement when the search of a home is for a person rather than for a thing. As previously noted, absent exigent circumstances or consent, an entry into a private dwelling to conduct a search or effect an arrest is unreasonable without a warrant. The second clause of the Fourth Amendment, which governs the issuance of such warrants, provides that "no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." This language plainly suggests that the same sort of judicial determination must be made when the search of a person's home is for another person as is necessary when the search is for an object. Specifically, absent exigent circumstances the magistrate, rather than the police officer, must make the decision that probable cause exists to believe that the person or object to be seized is within a particular place.

In *Payton,* of course, we recognized that an arrest warrant alone was sufficient to authorize the entry into a person's home to effect his arrest. We reasoned:

"If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law. Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." 445 U. S., at 602–603.

Because an arrest warrant authorizes the police to deprive a person of his liberty, it necessarily also authorizes a limited invasion of that person's privacy interest when it is necessary to arrest him in his home. This analysis, however, is plainly inapplicable when the police seek to use an arrest warrant as legal authority to enter the home of a third party to conduct a search. Such a warrant embodies no judicial determination whatsoever regarding the person whose home is to be searched. Because it does not authorize the police to deprive the third person of his liberty, it cannot embody any derivative authority to deprive this person of his interest in the privacy of his home. Such a deprivation must instead be based on an independent showing that a legitimate object of a search is located in the third party's home. We have consistently held, however,

A contrary conclusion—that the police, acting alone and in the absence of exigent circumstances, may decide when there is sufficient justification for searching the home of a third party for the subject of an arrest warrant—would create a significant potential for abuse. Armed solely with an arrest warrant for a single person, the police could search all the homes of that individual's friends and acquaintances. See, e. g., Lankford v. Gelston, 364 F. 2d 197 (CA4 1966) (enjoining police practice under which 300 homes were searched pursuant to arrest warrants for two fugitives). Moreover, an arrest warrant may serve as the pretext for entering a home in which the police have a suspicion, but not probable cause to believe, that illegal activity is taking place. Cf. Chimel v. California, 395 U. S. 752, 767 (1969). The Government recognizes the potential for such abuses,[8] but contends that existing remedies—such as motions to suppress illegally procured evidence and damages actions for Fourth Amendment violations—provide adequate means of redress. We do not agree. As we observed on a previous occasion, "[t]he [Fourth] Amendment is designed to prevent, not simply to redress, unlawful police action." Chimel v. California, supra, at 766, n. 12. Indeed, if suppression motions and damages actions were sufficient to implement the Fourth Amendment's prohibition against unreasonable searches and seizures, there would be no need for the constitutional requirement that in the absence of exigent circumstances a warrant

---

that such a determination is the province of the magistrate, and not that of the police officer.

[8] The Government concedes that "an arrest warrant may be thought to have some of the undesirable attributes of a general warrant if it authorizes entry into third party premises." Brief for United States 42. Similarly, the Government agrees that "the potential for abuse is much less if the implicit entry authorization of an arrest warrant is confined to the suspect's own residence and is not held to make the police free to search for the suspect in anyone else's house without obtaining a particularized judicial determination that the suspect is present." Ibid.

must be obtained for a home arrest or a search of a home for objects. We have instead concluded that in such cases the participation of a detached magistrate in the probable-cause determination is an essential element of a reasonable search or seizure, and we believe that the same conclusion should apply here.[9]

In sum, two distinct interests were implicated by the search at issue here—Ricky Lyons' interest in being free from an unreasonable seizure and petitioner's interest in being free from an unreasonable search of his home. Because the arrest warrant for Lyons addressed only the former interest, the search of petitioner's home was no more reasonable from petitioner's perspective than it would have been if conducted in the absence of any warrant. Since warrantless searches of a home are impermissible absent consent or exigent circumstances, we conclude that the instant search violated the Fourth Amendment.

## IV

The Government concedes that this view is "apparently logical," that it furthers the general policies underlying the Fourth Amendment, and that it "has the virtue of producing symmetry between the law of entry to conduct a search for things to be seized and the law of entry to conduct a search for persons to be seized." Brief for United States 36. Yet we are informed that this conclusion is "not without its flaws" in that it is contrary to common-law precedent and creates some practical problems of law enforcement. We treat these contentions in turn.

---

[9] Moreover, the remedies suggested by the Government are not without their pitfalls and limitations. For example, absent a search warrant requirement, a person seeking to recover civil damages for the unjustified search of his home may possibly be thwarted if a good-faith defense to such unlawful conduct is recognized. See, e. g., *Wallace* v. *King*, 626 F. 2d, at 1161.

## A

The common law may, within limits,[10] be instructive in determining what sorts of searches the Framers of the Fourth Amendment regarded as reasonable. See, *e. g.*, *Payton* v. *New York*, 445 U. S., at 591. The Government contends that at common law an officer could forcibly enter the home of a third party to execute an arrest warrant. To be sure, several commentators do suggest that a constable could "break open doors" to effect such an arrest. See 1 J. Chitty, Criminal Law *57 (Chitty); M. Foster, Crown Law 320 (1762) (Foster); 2 M. Hale, Pleas of the Crown 116–117 (1st Am. ed. 1847) (Hale). But see 4 E. Coke, Institutes *177. As support for this proposition, these commentators all rely on a single decision, *Semayne's Case*, 5 Co. Rep. 91a, 92b–93a, 77 Eng. Rep. 194, 198 (K. B. 1603).[11] See 1 Chitty *57;

---

[10] The significance accorded to such authority, however, must be kept in perspective, for our decisions in this area have not "simply frozen into constitutional law those enforcement practices that existed at the time of the Fourth Amendment's passage." *Payton* v. *New York*, 445 U. S., at 591, n. 33. The common-law rules governing searches and arrests evolved in a society far simpler than ours is today. Crime has changed, as have the means of law enforcement, and it would therefore be naive to assume that those actions a constable could take in an English or American village three centuries ago should necessarily govern what we, as a society, now regard as proper. Cf. *Katz* v. *United States*, 389 U. S. 347, 352–353 (1967). Instead, the Amendment's prohibition against "unreasonable searches and seizures" must be interpreted "in light of contemporary norms and conditions." *Payton* v. *New York, supra*, at 591, n. 33.

[11] The three other decisions cited by the Government do not address the issue raised here. *Johnson* v. *Leigh*, 6 Taunt. 246, 248, 128 Eng. Rep. 1029, 1029–1030 (C. P. 1815), dealt with the authority of a constable to enter the home of a third person to make an arrest when the "outer door" was open. Under the common law, "a privilege attaches to the outer door of a dwelling, because . . . it is the owner's castle." *Hutchison* v. *Birch*, 4 Taunt. 619, 625, 128 Eng. Rep. 473, 476 (C. P. 1812). Thus, an open outer door was apparently regarded as the equivalent of a consent of the occupant for the constable to enter the home and conduct a search. The other two decisions cited by the Government, *Sheers* v. *Brooks*, 2 Bl. H.

Foster 320; 2 Hale 116. Although that case involved only the authority of a sheriff to effect civil service on a person within his own home, the court noted in dictum that a person could not "escape the ordinary process of law" by seeking refuge in the home of a third party. 5 Co. Rep., at 93a, 77 Eng. Rep., at 198. However, the language of the decision, while not free from ambiguity, suggests that forcible entry into a third party's house was permissible only when the person to be arrested was pursued to the house. The decision refers to a person who "flies" to another's home, *ibid.*, and the annotation notes that "in order to justify the breaking of the outer door; after denial on request to take a person . . . in the house of a stranger, it must be understood . . . that the person *upon a pursuit* taketh refuge in the house of another." *Id.*, at 93a, n. (I), 77 Eng. Rep., at 198, n. (I) (emphasis in original). The common-law commentators appear to have adopted this limitation. See 1 Chitty *57 (sheriff may enter third parties' home "if the offender fly to it for refuge"); Foster 320 ("For if a Stranger whose ordinary Residence is elsewhere, upon a Pursuit taketh Refuge in the House of another, this is not *his* Castle, He cannot claim the Benefit of Sanctuary in it"); 2 Hale 116, n. 20 (forcible entry permissible "only upon strong necessity"). We have long recognized that such "hot pursuit" cases fall within the exigent-circumstances exception to the warrant requirement, see *Warden* v. *Hayden*, 387 U. S. 294 (1967), and therefore are distinguishable from the routine search situation presented here.

More important, the general question addressed by the common-law commentators was very different from the issue presented by this case. The authorities on which the Government relies were concerned with whether the *subject* of the arrest warrant could claim sanctuary from arrest by hiding

---

120, 122, 126 Eng. Rep. 463, 464 (C. P. 1792), and *Kelsy* v. *Wright*, 1 Root 83 (Conn. 1783), dealt only with the authority of the constable to enter the home of the person to be arrested.

in the home of a third party. See 1 Chitty *57; Foster 320; 2 Hale 116–117. Thus, in *Semayne's Case* it was observed:

> "[T]he house of any one is not a castle or privilege but for himself, and shall not extend to protect any person who flies to his house, or the goods of any other which are brought and conveyed into his house, to prevent a lawful execution, and to escape the ordinary process of law; for the privilege of his house extends only to him and his family, and to his own proper goods." 5 Co. Rep., at 93a, 77 Eng. Rep., at 128.

The common law thus recognized, as have our recent decisions, that rights such as those conferred by the Fourth Amendment are personal in nature, and cannot bestow vicarious protection on those who do not have a reasonable expectation of privacy in the place to be searched. See *United States* v. *Salvucci*, 448 U. S. 83 (1980); *Rakas* v. *Illinois*, 439 U. S. 128 (1978). The issue here, however, is not whether the subject of an arrest warrant can object to the absence of a search warrant when he is apprehended in another person's home, but rather whether the residents of that home can complain of the search. Because the authorities relied on by the Government focus on the former question without addressing the latter, we find their usefulness limited. Indeed, if anything, the little guidance that can be gleaned from common-law authorities undercuts the Government's position. The language of *Semayne's Case* quoted above, for example, suggests that although the subject of an arrest warrant could not find sanctuary in the home of the third party, the home remained a "castle or privilege" for its residents. Similarly, several commentators suggested that a search warrant, rather than an arrest warrant, was necessary to fully insulate a constable from an action for trespass brought by a party whose home was searched. See, *e. g.*, 1 Chitty *57; 2 Hale 116–117, 151.

While the common law thus sheds relatively little light on the narrow question before us, the history of the Fourth Amendment strongly suggests that its Framers would not have sanctioned the instant search. The Fourth Amendment was intended partly to protect against the abuses of the general warrants that had occurred in England and of the writs of assistance used in the Colonies. See *Payton* v. *New York*, 445 U. S., at 608–609 (WHITE, J., dissenting); *Boyd* v. *United States*, 116 U. S. 616, 624–629 (1886); N. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 13–78 (1937). The general warrant specified only an offense—typically seditious libel—and left to the discretion of the executing officials the decision as to which persons should be arrested and which places should be searched. Similarly, the writs of assistance used in the Colonies noted only the object of the search—any uncustomed goods—and thus left customs officials completely free to search any place where they believed such goods might be. The central objectionable feature of both warrants was that they provided no judicial check on the determination of the executing officials that the evidence available justified an intrusion into any particular home. *Stanford* v. *Texas*, 379 U. S. 476, 481–485 (1965). An arrest warrant, to the extent that it is invoked as authority to enter the homes of third parties, suffers from the same infirmity.[12] Like a writ of assistance, it specifies only the object of a search—in this case, Ricky Lyons—and leaves to the unfettered discretion of the police the decision as to which particular homes should be searched. We do not believe that the Framers of the Fourth Amendment would have condoned such a result.

## B

The Government also suggests that practical problems might arise if law enforcement officers are required to obtain

---

[12] The Government recognizes this problem. See n. 8, *supra*.

a search warrant before entering the home of a third party to make an arrest.[13]   The basis of this concern is that persons, as opposed to objects, are inherently mobile, and thus officers seeking to effect an arrest may be forced to return to the magistrate several times as the subject of the arrest warrant moves from place to place.   We are convinced, however, that a search warrant requirement will not significantly impede effective law enforcement efforts.

First, the situations in which a search warrant will be necessary are few.   As noted in *Payton* v. *New York, supra,* at 602–603, an arrest warrant alone will suffice to enter a suspect's own residence to effect his arrest.   Furthermore, if probable cause exists, no warrant is required to apprehend a suspected felon in a public place.   *United States* v. *Watson,* 423 U. S. 411 (1976).   Thus, the subject of an arrest warrant can be readily seized before entering or after leaving the home of a third party.[14]   Finally, the exigent-circumstances doctrine significantly limits the situations in which a search warrant would be needed.   For example, a warrantless entry of a home would be justified if the police were in "hot pursuit" of a fugitive.   See *United States* v. *Santana,* 427 U. S. 38, 42–43 (1976); *Warden* v. *Hayden,* 387 U. S. 294

---

[13] A number of Circuits already require a search warrant for entries of this sort, see n. 3, *supra,* and there is no indication in the record that law enforcement efforts in these jurisdictions have suffered as a result. Thus, we are inclined to view the Government's argument on this point with considerable skepticism.   Cf. *Payton* v. *New York,* 445 U. S., at 602.

Moreover, we are informed by the Government that "it is the present policy of the Drug Enforcement Administration, whose agents conducted the search in the present case, to secure a search warrant prior to making an arrest entry into third party premises, in the absence of exigent circumstances or consent."   Brief in Opposition 9, n. 7.

[14] Indeed, the "inherent mobility" of persons noted by the Government suggests that in most situations the police may avoid altogether the need to obtain a search warrant simply by waiting for a suspect to leave the third person's home before attempting to arrest that suspect.

(1967). Thus, to the extent that searches for persons pose special problems, we believe that the exigent-circumstances doctrine is adequate to accommodate legitimate law enforcement needs.

Moreover, in those situations in which a search warrant is necessary, the inconvenience incurred by the police is simply not that significant. First, if the police know of the location of the felon when they obtain an arrest warrant, the additional burden of obtaining a search warrant at the same time is miniscule. The inconvenience of obtaining such a warrant does not increase significantly when an outstanding arrest warrant already exists. In this case, for example, Agent Goodowens knew the address of the house to be searched two days in advance, and planned the raid from the federal courthouse in Atlanta where, we are informed, three full-time magistrates were on duty. In routine search cases such as this, the short time required to obtain a search warrant from a magistrate will seldom hinder efforts to apprehend a felon. Finally, if a magistrate is not nearby, a telephonic search warrant can usually be obtained. See Fed. Rule Crim. Proc. 41 (c)(1), (2).

Whatever practical problems remain, however, cannot outweigh the constitutional interests at stake. Any warrant requirement impedes to some extent the vigor with which the Government can seek to enforce its laws, yet the Fourth Amendment recognizes that this restraint is necessary in some cases to protect against unreasonable searches and seizures. We conclude that this is such a case. The additional burden imposed on the police by a warrant requirement is minimal. In contrast, the right protected—that of presumptively innocent people to be secure in their homes from unjustified, forcible intrusions by the Government—is weighty. Thus, in order to render the instant search reasonable under the Fourth Amendment, a search warrant was required.

Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded to that court for further proceedings consistent with this opinion.

*So ordered.*

THE CHIEF JUSTICE concurs in the judgment.

JUSTICE REHNQUIST, with whom JUSTICE WHITE joins, dissenting.

The Court's opinion reversing petitioner's conviction proceeds in a pristinely simple manner: Steagald had a Fourth Amendment privacy interest in the dwelling entered by the police, and even though the police entered the premises for the sole purpose of executing a valid arrest warrant for Lyons, a fugitive from justice, whom they had probable cause to believe was within, the arrest warrant was not sufficient absent exigent circumstances to justify invading Steagald's privacy interest in the dwelling. Petitioner Steagald's privacy interest is different from Lyons' interest in being free from an unreasonable seizure, according to the Court, and the arrest warrant only validated the invasion of the latter. In the words of the Court:

> "[T]he search of petitioner's home was no more reasonable from petitioner's perspective than it would have been if conducted in the absence of any warrant. Since warrantless searches of a home are impermissible absent consent or exigent circumstances, we conclude that the instant search violated the Fourth Amendment." *Ante,* at 216.

This "reasoning" not only assumes the answer to the question presented—whether the search of petitioner's dwelling could be undertaken without a search warrant—but also conveniently ignores the critical fact in this case, the existence of an arrest warrant for a fugitive believed on the basis of probable cause to be in the dwelling. The Court assumes

that because the arrest warrant did not specifically address petitioner's privacy interest it is of no further relevance to the case. Incidental infringements of distinct Fourth Amendment interests may, however, be reasonable when they occur in the course of executing a valid warrant addressed to other interests. In *Dalia* v. *United States,* 441 U. S. 238 (1979), the Court rejected the argument that a separate search warrant was required before police could enter a business office to install an eavesdropping device when a warrant authorizing the eavesdropping itself had already been obtained. As the Court put it: "This view of the Warrant Clause parses too finely the interests protected by the Fourth Amendment. *Often in executing a warrant the police may find it necessary to interfere with privacy rights not explicitly considered by the judge who issued the warrant.*" *Id.,* at 257 (emphasis supplied). In *Payton* v. *New York,* 445 U. S. 573 (1980), the Court rejected the suggestion that a separate search warrant was required before police could execute an arrest warrant by entering the home of the subject of the warrant. Although the subject of the warrant had a Fourth Amendment interest in the privacy of his dwelling quite distinct from the interest in being free from unreasonable seizures addressed by the arrest warrant, the Court concluded that it was "constitutionally reasonable to require him to open his doors to the officers of the law." *Id.,* at 602–603.

This case, therefore, cannot be resolved by the simple Aristotelian syllogism which the Court employs. Concluding as it does that the arrest warrant did not address the privacy interest affected by the search by no means ends the matter; it simply presents the issue for decision. Resolution of that issue depends upon a balancing of the "need to search against the invasion which the search entails." *Camara* v. *Municipal Court of San Francisco,* 387 U. S. 523, 537 (1967). Here, as in all Fourth Amendment cases, "reasonableness is still the ultimate standard." *Id.,* at 539. See *Wyman* v. *James,* 400 U. S. 309, 318 (1971); *Marshall* v. *Barlow's, Inc.,*

436 U. S. 307, 315–316 (1978). In determining the reasonableness of dispensing with the requirement of a separate search warrant in this case, I believe that the existence of a valid arrest warrant is highly relevant.

The government's interests in the warrantless entry of a third-party dwelling to execute an arrest warrant are compelling. The basic problem confronting police in such situations is the inherent mobility of the fugitive. By definition, the police have probable cause to believe that the fugitive is in a dwelling which is not his home. He may stay there for a week, a day, or 10 minutes. Fugitives from justice tend to be mobile, and police officers will generally have no way of knowing whether the subject of an arrest warrant will be at the dwelling when they return from seeking a search warrant. See *United States* v. *McKinney,* 379 F. 2d 259, 263 (CA6 1967); *State* v. *Jordan,* 288 Ore. 391, 400–401, 605 P. 2d 646, 651 (1980) (en banc). Imposition of a search warrant requirement in such circumstances will frustrate the compelling interests of the government and indeed the public in the apprehension of those subject to outstanding arrest warrants.

The Court's responses to these very real concerns are singularly unpersuasive. It first downplays them by stating that "the situations in which a search warrant will be necessary are few," *ante,* at 221, because no search warrant is necessary to arrest a suspect at his home and, if the suspect is at another's home, the police need only wait until he leaves, since no search warrant is needed to arrest him in a public place. *Ibid.* These beguilingly simple answers to a serious law enforcement problem simply will not wash. Criminals who know or suspect they are subject to arrest warrants would not be likely to return to their homes, and while "[t]he police could reduce the likelihood of escape by staking out all possible exits . . . the costs of such a stakeout seem excessive in an era of rising crime and scarce police re-

sources." *Payton* v. *New York, supra,* at 619 (WHITE, J., dissenting). The Court's ivory tower misconception of the realities of the apprehension of fugitives from justice reaches its apogee when it states: "In routine search cases such as this, the short time required to obtain a search warrant from a magistrate will seldom hinder efforts to apprehend a felon." *Ante,* at 222. The cases we are considering are *not* "routine search cases." They are cases of attempted arrest, pursuant to a warrant, when the object of the arrest may flee at any time—including the "short time" during which the police are endeavoring to obtain a search warrant.

At the same time the interference with the Fourth Amendment privacy interests of those whose homes are entered to apprehend the felon is not nearly as significant as suggested by the Court. The arrest warrant serves some of the functions a separate search warrant would. It assures the occupants that the police officer is present on official business. The arrest warrant also limits the scope of the search, specifying what the police may search for—*i. e.,* the subject of the arrest warrant. No general search is permitted, but only a search of those areas in which the object of the search might hide. See *Fisher* v. *Volz,* 496 F. 2d 333, 343 (CA3 1974); *State* v. *Jordan, supra,* at 400–401, 605 P. 2d, at 651; *United States* v. *Cravero,* 545 F. 2d 406, 421, nn. 1, 2 (CA5 1976), cert. denied, 429 U. S. 1100 and 430 U. S. 983 (1977). Indeed there may be no intrusion on the occupant's privacy at all, since if present the suspect will have the opportunity to voluntarily surrender at the door. Even if the suspect does not surrender but secretes himself within the house, the occupant can limit the search by pointing him out to the police. It is important to remember that the contraband discovered during the entry and search for Lyons was in plain view, and was discovered during a "sweep search" for Lyons, not a probing of drawers or cabinets for contraband. *United States* v. *Gaultney,* 606 F. 2d 540, 544 (1979).

Because the burden on law enforcement officers to obtain a separate search warrant before entering the dwelling of a third party to execute a concededly valid arrest warrant is great, and carries with it a high possibility that the fugitive named in the arrest warrant will escape apprehension, I would conclude that the application of the traditional "reasonableness" standard of the Fourth Amendment does not require a separate search warrant in a case such as this.

This conclusion is supported by the common law as it existed at the time of the framing of the Fourth Amendment, which incorporated the standard of "reasonableness." As the Court noted last Term in *Payton:* "An examination of the common-law understanding of an officer's authority to arrest sheds light on the obviously relevant, if not entirely dispositive, consideration of what the Framers of the Amendment might have thought to be reasonable." 445 U. S., at 591; see also *id.,* at 604 (WHITE, J., dissenting). The duty of the populace to aid in the apprehension of felons was well established at common law, see *Roberts* v. *United States,* 445 U. S. 552, 557 (1980), and in light of the overriding interest in apprehension, the common law permitted officers to enter the dwelling of third parties when executing an arrest warrant. Chitty wrote that "[t]he house of a third person, if the offender fly to it for refuge, is not privileged, but may be broken open after the usual demand; for it may even be so upon civil process." 1 J. Chitty, Criminal Law *57 (hereafter Chitty). Gabbett agreed: "Neither is the house of a third person, if the offender fly to it for refuge, privileged, but it may be broken open, after the usual demand; for it may be even so upon civil process." 2 J. Gabbett, Criminal Law 142 (1843) (hereafter Gabbett). Hale noted that an officer could forcibly enter the house of the subject of an arrest warrant, "[a]nd so much more may he break open the house of another person to take him, for so the sheriff may do upon a civil process." 2 M. Hale, Pleas of the Crown 117

(1736) (hereafter Hale). See also M. Foster, Crown Law 320 (1762).[1] A 17-century work on constables noted:

> "[I]t is the chief part of their office to represse fellony, and albeit it be a man's house he doth dwell in, which they doe suspect the fellon to be in, yet they may enter in there to search; and if the owner of the house, upon request, will not open his dores, it seems the officer may break open the dores upon him to come in to search." W. Sheppard, The Offices of Constables, ch. 8, § 2, no. 4 (c. 1650) (quoted in T. Taylor, Two Studies in Constitutional Interpretation 28–29 (1969)).

The leading authority, *Semayne's Case,* 5 Co. Rep. 91a, 93a, 77 Eng. Rep. 194, 198 (K. B. 1603), recognized that "[t]he house of any one is not a castle or privilege but for himself, and shall not extend to protect any person who flies to his house . . . to prevent a lawful execution, and to escape the ordinary process of law . . . and therefore in such cases after denial on request made, the sheriff may break the house." In *Ratcliffe* v. *Burton,* 3 Bos. & Pul. 223, 230, 127 Eng. Rep. 123, 126–127 (C. P. 1802), Judge Heath ruled that before breaking doors, officers must announce their authority, because a contrary rule "must equally hold good in cases of process upon escape, where the party has taken refuge in the house of a stranger. Shall it be said that in such case the officer may break open the outer door of a stranger's house without declaring the authority under which he acts . . . ?" Thus no distinction was recognized between authority to enter the suspect's home and that of a stranger. See also

---

[1] The Court cites Coke as a contrary authority, *ante,* at 217, but Coke's disagreement with the rule that the constable could "break open doors" extended only to requiring that the suspect sought first be indicted. He wrote that "if the party suspected be indicted, then the sherif by force of the kings writ may demand the party indicted to be delivered; and that not done, he may break open the house, &c. and apprehend the felon . . . ." 4 E. Coke, Institutes *177. Lyons had been indicted, *United States* v. *Gaultney,* 606 F. 2d 540, 543 (1979).

*Commonwealth* v. *Reynolds,* 120 Mass. 190, 196–197 (1876); cf. *State* v. *Brown,* 5 Del. 505 (1854).[2]

The Court argues that the common-law authorities are not relevant because they do not consider the rights of third parties whose dwellings were entered but only the rights of the arrestee. *Ante,* at 218–219. This is not so. The authorities typically concern the right of the third party to resist the officer's attempted entry or the offense committed by the officer against the third party in entering. See, *e. g., Commonwealth* v. *Reynolds, supra;* 1 Chitty *57–*58; 2 Hale 117; 1 Russell 519–521.

The basic error in the Court's treatment of the common law is its reliance on the adage that "a man's home is his castle." Though there is undoubtedly early case support for this in the common law, it cannot be accepted as an uncritical statement of black letter law which answers all questions in this area. William Pitt, when he was Prime Minister of England, used it with telling effect in a speech on the floor of the House of Commons; but parliamentary speaking ability and analytical legal ability ought not to be equated with one

---

[2] The Court strives to minimize the significance of the common-law rule by suggesting that it only applied in cases of "hot pursuit," *ante,* at 218. Even if the authorities did impose some "pursuit" requirement, and by no means all did, see, *e. g.,* 2 Hale 117; 1 W. Russell, Crimes and Misdemeanors 521 (2d ed. 1826) (hereafter Russell), the "pursuit" referred to was apparently "the old Common Law mode of pursuing," by the "hue and cry." 1 Chitty *26; 4 W. Blackstone, Commentaries 293 (J. Wendell ed. 1847); 2 Hale 98. See *Semayne's Case,* 5 Co. Rep. 91a, 91b–93a, 77 Eng. Rep. 194, 196 (K. B. 1603) ("J. beats R. so as he is in danger of death, J. flies, and thereupon hue and cry is made, J. retreats into the house of T. they who pursue him, if the house be kept and defended with force (which proves that first request ought to be made) may lawfully break the house of T. for it is at the K.'s suit"). The "hue and cry," however, was not the same as "hot pursuit" by officers of the law, and the situations in which it might be invoked—for example, simply to apprehend a person suspected of a felony—would not be considered exigent circumstances. See 1 Chitty *27–*29.

another. It is clear that the privilege of the home did not extend when the King was a party, *i. e.,* when a warrant in a criminal case had been issued. See 1 Russell 520; 2 Gabbett 141; *Burdett* v. *Abbott,* 14 East. 1, 79, 104 Eng. Rep. 501, 531 (K. B. 1811); *Commonwealth* v. *Reynolds, supra,* at 196. That a man's home may be his castle in civil cases, but not in criminal cases, was recognized as far back as the Year Books. See Y. B. 13 Ewd. IV, f. 9a (quoted in *Burdett, supra,* at 79, 104 Eng. Rep., at 531). The suggestion in the Court's opinion, *ante,* at 219, that "[t]he language of *Semayne's Case* . . . suggests that although the subject of an arrest warrant could not find sanctuary in the home of the third party, the home remained a 'castle or privilege' for its residents," is thus completely unfounded in the present context.

An officer could break into one's own home to execute an arrest warrant for the owner, and "so much more may he break open the house of another person to take him," 2 Hale 117. Entry into the house of a third party to effect arrest was considered to follow *a fortiori* from the accepted entry into the home of the subject of the arrest warrant himself. This was because those in the home of a third party had no protection against civil process, let alone criminal process. See 1 Chitty *57; 2 Gabbett 142; 2 Hale 117. See generally Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 798, 800–801 (1924). At common law the Sovereign's key—criminal process—unlocked all doors, whether to apprehend the owner or someone else.

While I cannot subscribe to the Court's decision today, I will not falsely cry "wolf" in this dissent. The decision rests on a very special set of facts, and with a change in one or more of them it is clear that no separate search warrant would be required even under the reasoning of the Court.

On the one side *Payton* makes clear that an arrest warrant is all that is needed to enter the suspect's "home" to effect the arrest. 445 U. S., at 602–603. If a suspect has been living in a particular dwelling for any significant period, say

a few days, it can certainly be considered his "home" for Fourth Amendment purposes, even if the premises are owned by a third party and others are living there, and even if the suspect concurrently maintains a residence elsewhere as well. In such a case the police could enter the premises with only an arrest warrant. On the other side, the more fleeting a suspect's connection with the premises, such as when he is a mere visitor, the more likely that exigent circumstances will exist justifying immediate police action without departing to obtain a search warrant. The practical damage done to effective law enforcement by today's decision, without any basis in the Constitution, may well be minimal if courts carefully consider the various congeries of facts in the actual case before them.

The genuinely unfortunate aspect of today's ruling is not that fewer fugitives will be brought to book, or fewer criminals apprehended, though both of these consequences will undoubtedly occur; the greater misfortune is the increased uncertainty imposed on police officers in the field, committing magistrates, and trial judges, who must confront variations and permutations of this factual situation on a day-to-day basis. They will, in their various capacities, have to weigh the time during which a suspect for whom there is an outstanding arrest warrant has been in the building, whether the dwelling is the suspect's home, how long he has lived there, whether he is likely to leave immediately, and a number of related and equally imponderable questions. Certainty and repose, as Justice Holmes said, may not be the destiny of man, but one might have hoped for a higher degree of certainty in this one narrow but important area of the law than is offered by today's decision.