1MICHAEL E. KIRBY, Judge.
STATEMENT OF CASE
On July 26, 1990 the defendant was indicted by the grand jury on ten charges. These were: Count 1-attempted second degree murder, Count 2-attempted armed robbery, Count 3-attempted armed robbery; Count 4-attempted second degree murder; Count 5-attempted armed robbery; Count 6-attempted armed robbery; Count 7-second degree murder; Count 8-armed robbery; Count 9-attempted second degree murder, and Count 10-armed robbery. The defendant pled not guilty to all charges at his arraignment on August 14, 1990. Defendant filed motions to suppress the evidence, confession, and identification. Hearings were conducted on September 14 and 21, 1990. On October 26, 1990, the trial court denied the motions.
Counts 9 and 10 were severed from the other counts for trial. The defendant was tried by jury on April 9 and 10, 1991 on Counts 1-8. He was found guilty as charged on each of the eight counts.
Defendant was sentenced on April 19, 1991 to (1) fifty years at hard labor with credit for time served and court costs waived on Counts 1 and 4, (2) forty-nine and one half years at hard labor without benefit of parole, probation or | ¡.suspension of sentence, with credit for time served and court costs waived on each of Counts 2, 3, 5, and 6, (3) life imprisonment at hard labor without benefit of probation, parole or suspension of sentence, with credit for time served and court costs waived on Count 7, and (4) ninety-nine years at hard labor without benefit of probation, parole or suspension of sentence, with credit for time served and court costs waived on Count 8.
The sentences imposed on Counts 1-6 were to run concurrently with each other. The sentences imposed on Counts 7 and 8 were to run concurrently with each other and consecutively with the sentences imposed for Counts 1-6.
The conviction and sentence were affirmed on appeal by this court. State v. Knight, 602 So.2d 343 (La.App.1992). On December 4, 2000, the trial court granted defendant an out-of-time appeal.
STATEMENT OF THE FACTS
On June 8, 1990 at about 11:00 p. m., as Gregory Chapman and Henry Mitchell were walking down Clio Street, a red Cá-maro pulled up to them as they reached the intersection of Clio and South Roman. A man got out of the passenger side of the car and told them to give him their money. Mitchell said that he did not have any. The man shot Chapman in the chest, got back in his car and left. Chapman passed out. Mitchell called an ambulance and the police.
Shortly thereafter, ten to fifteen blocks from the first robbery, Kenny Brown and Robert Mitchell walked down the street on the way to the store. As they reached the *1197 intersection of Second and South Roman, two men approached them. One pulled out a shotgun and told them to give him their money. Brown said he didj^not have any money and started to walk off. The man with the gun shot Brown in the back and ran off. Mitchell called the pólice.
At about 1:30 a.m. on June 9, 1990, as Yolanda Barbarin was walking home from work up Liberty Street, she saw a man drive past her in a red Camaro. He stopped the car and got out at the intersection of Fourth and Liberty. He was carrying a gun. He walked around the corner and Ms. Barbarin could no longer see him. However, she heard a gunshot. Then she saw this man return to the Ca-maro and drive off.
Ora McDonald testified that, as she was sitting on the porch at Fourth and Loyola at about 2:00 a.m. on June 9, 1990, she looked down Fourth Street and saw Richard Wells and another man. She saw Richard Wells lean against the car with his hands up as the other man searched him. She realized that Wells was being robbed. She ran inside and told her son to call 911. She then saw the man shoot Wells.
On June 8, 1990 Valerie Berry’s car broke down. She called her car repairman, Ray Charles Johnson. He came to pick her up in his red Camaro. He was accompanied by the defendant. Berry and the defendant got in the Camaro, while Johnson followed them in Berry’s car. Johnson then turned off. Berry and the defendant drove to Berry’s sister-in-law’s house. The defendant left in Johnson’s red Camaro. He did not return it. Berry and Johnson looked for the car all weekend. They finally found it on Monday morning parked at the defendant’s girlfriend’s house in the Magnolia Housing Project.
In the meanwhile, an officer investigating the offenses had seen the red Camaro in the Magnolia Housing Project and traced its ownership to Johnson. Johnson told the officer that the defendant had the Camaro over the weekend when |4the offenses were committed. The police discovered that the defendant was wanted on a municipal attachment. They subsequently went to the defendant’s mother’s house, where they found the defendant hiding in the closet, and arrested him. The police discovered a shotgun in the bedroom. Defendant’s mother signed a consent to search and the officer’s found two shotgun shells in the bedroom as well.
After his arrest, the defendant made a statement to the police, which was read to the jury at trial. In it, the defendant said that he was with Melvin Rollins when Rollins committed each of the crimes and that Rollins was the one who actually shot the victims while he either waited in the car or stood by.
Subsequently, Gregory Chapman, the man who was shot in the first robbery, and Robert Mitchell, one of the victims of the second robbery, identified the defendant as the perpetrator in those crimes in a photographic line-up.
ERRORS PATENT
A review of the record for errors patent reveals none.
ASSIGNMENT OF ERROR NUMBER 1
Defendant contends the trial court erred in denying the motion to suppress evidence and statements. Following the hearings on the defendant’s motions, defendant filed a post hearing memorandum wherein he argued that the entry into the defendant’s home was warrantless because the municipal attachment did not fulfill the Fourth Amendment’s requirement of a valid warrant founded on probable cause. The trial court denied the motions stating as follows:
*1198 lfiThe court denies the motion to suppress the alleged statement for the following reasons. I find that the municipal attachment exists, (sic) that it was grounds for the police to go to the home of this gentleman to arrest him. I find that even if the attachment had not issued, even if there had not in effect been a bench warrant issued for the arrest of this gentleman from municipal court, that as to this alleged confession it would be admissible under the new decision from 1990, from the United States Supreme Court, New York versus Harris.As to the alleged seizure of the particular shotgun and the two shells that are alleged evidence in this case, I find that there would be a basis for admitting these under Payton versus New York with the attachment from Municipal Court, that bench warrant for the arrest of the gentleman being a sufficient basis for the officers to enter without a formal arrest warrant from this court as to the State charges. I also find secondarily that the consent of the mother in this case was free and voluntary and would form an additional basis for the admission of these physical exhibits.
Defendant filed a writ from the trial court’s ruling with this court, which was denied. State v. Knight, 602 So.2d 343 (La.App.1992).
Defendant now contends that the trial court erred in denying the motions on the basis that the officers lacked specific knowledge that the defendant resided at the house in question. Citing Steagald v. United States, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) and State v. Wolfe, 398 So.2d 1117 (La.1981), defendant argues that because the entry into the dwelling was invalid, the subsequent search, consent to search, and confession were fruits of the poisonous tree. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
In Steagald v. United States, federal agents learned from a confidential informant that they could find a fugitive at the home of Gary Steagald. The agents entered Steagald’s residence armed with an arrest warrant for the fugitive. They did not have a search warrant for Steagald’s house. The agents did not find the fugitive in the house, but while they were there, they searched the house and found |fia large quantity of cocaine, which led to Steagald’s prosecution on federal drug charges. Steagald moved to suppress the drug evidence on the ground that the search and seizure violated his Fourth Amendment rights. The motion was denied and he was convicted.
The Steagald Court considered the narrow question of whether an arrest warrant, as opposed to a search warrant, was adequate to protect the Fourth Amendment rights of a person not named in the warrant. The Court held that, absent consent or exigent circumstances, the Fourth Amendment required the agents to secure a search warrant to enter Steagald’s home to look for the fugitive.
State v. Wolfe concerned a set of facts nearly identical to those in Steagald. Police entered the apartment of the defendant in search of a third party for whom they had an arrest warrant. Subsequent to the entry the police recovered marijuana in the residence. Relying on Steagald, our Supreme Court found that because the entry was warrantless the evidence should have been suppressed. The court also concluded that the police lacked probable cause to believe that the fugitive was located in the defendant’s apartment.[1] Finally, *1199 the court determined under the facts of the case that if the defendant consented, the consent was coerced.
| vIt should be noted that in Steagald, the Supreme Court did not consider the issue whether the police had probable cause to believe that the fugitive was in Steagald’s home. The issue was superseded by the Court’s determination that the Fourth Amendment requires “the detached scrutiny of a judicial officer” and that an officer’s “personal determination of probable cause”, “regardless of how reasonable” is insufficient. Steagald, 101 S.Ct. at 1648. The fact that the officers in Wolfe acted without sufficient probable cause to believe the fugitive could be located at the apartment in question was ancillary to the constitutionality of the search as it was conducted without a warrant or consent. Because the court did not need to reach the issue of probable cause in Wolfe, that determination was superfluous and therefore dicta.
In State v. Barrett, 408 So.2d 903 (La.1981), the court addressed the issue of whether “the subject of an arrest warrant in the house of a third person where entry was accomplished without a search warrant or exigent circumstances or consent, was ‘adversely affected’[2] so as to require suppression of evidence seized incidental to his lawful arrest.” Id. at 905. The Court found otherwise, saying:
Had defendant been arrested in his own home, under Payton,[3] the arrest warrant would have been adequate to safeguard his constitutional rights. Hence, if we were to agree with defendant’s contention, the result would be that he would enjoy greater protection against | ¿‘unreasonable searches, seizures, or invasions of privacy” in the house of a third party than in his own home. On the other hand, we recognize that but for the fact of defendant’s presence in Condriff s house, he would not have been arrested and evidence seized from his person. Nonetheless, we are not prepared to say that, within the meaning and purpose of our constitutional provision, defendant was “ad *1200 versely affected” by the illegal entry into Condriffs house so as to require suppression of the evidence seized from his person. We do not consider that the previously issued valid arrest warrant was affected by the illegal entry into Condriffs house. Nor did it affect the search of defendant made as an incident to that arrest within the area of his immediate control. Hence, the trial judge properly denied defendant’s motion to suppress.
408 So.2d at 905.
In State v. Johnson, 437 So.2d 350, (La.App. 4 Cir.1983), police arrested the defendant pursuant to a valid arrest warrant at his mother’s house. Testimony reflected that he normally resided at his grandmother’s house, which was located across the street. Furthermore, it was submitted that he was “in and out” of both residences. Defendant successfully moved the trial court to suppress two guns recovered in the bed where he was hiding at the time of his arrest. This court, relying on Barrett, found that “the arrest warrant adequately protected any privacy interest that Johnson had in his mother’s house,” Johnson, 437 So.2d at 352, and reversed the judgment of the district court.[4]
In the instant matter, there was no testimony as to whether defendant maintained a separate residence from his mother,[5] although there was testimony that the family members told the officers that the room where the defendant was 1 ¡located was the room where he stayed. Furthermore, the arresting officers were not questioned concerning their basis for believing that defendant was present at his mother’s residence, and it is unknown whether the municipal court attachment itself served as the basis for the officers’ belief as it is not contained in the record.
Despite the inadequacies of the record concerning the location of defendant’s principal residence, or the officer’s basis for believing that Knight could be located in his mother’s house, Barrett and Johnson form a sufficient basis to rule on the claim. In Steagald the constitutional challenge was raised by the person whose house was searched. Steagald held that an arrest warrant does not protect the Fourth Amendment interests of a person not named in the warrant when the home of the person not the subject of the arrest warrant is searched. Furthermore, defendant cannot “enjoy greater protection against ‘unreasonable searches, seizures, or invasions of privacy’ in the house of a third party than in his own home.” State v. Barrett, 408 So.2d at 905. Accordingly, the municipal court attachment served as sufficient basis to adequately protect any privacy interest that defendant had in his mother’s house.
Furthermore, the issue can be resolved by the trial court’s determination that Knight’s mother’s consent to the search was both free and voluntary. Both the Steagald Court and the Wolfe court recognized that consent is a valid exception to the requirement of a warrant.[6]
*1201 ^CONCLUSION
For the above reasons we affirm the defendant’s convictions and sentences.
AFFIRMED.

. The court’s discussion concerning the lack of probable cause was as follows:
*1199 At about two in the morning on the day in question, based on a tip from a confidential informer, the officers attempted to enter defendant's apartment to execute the arrest warrant. They did not have a search warrant for defendant's apartment. Other than the tip from the informer, they had no reason to believe that Dena Riser was located there. There was no showing of how the informer had proven reliable in the past or that the information supplied by him was credible. Nor did the officers taken [sic] any steps to independently corroborate the tip that had been supplied by the informer. Under these circumstances, the officers lacked probable cause to believe that Dena Riser, the subject of the arrest warrant, would be found in defendant's apartment. Moreover, no exigent circumstances existed that would permit the officers to dispense with the requirement of a search warrant. Hence, under Steagald, the warrantless search of defendant’s apartment was impermissible unless based upon defendant’s consent.
State v. Wolfe, 398 So.2d at 1120.

. La. Const, art. 1, Sec. 5 (1974) provides:
Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court. (Emphasis added.)

. Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) "recognized that an arrest warrant alone was sufficient to authorize the entry into a person’s home to effect his arrest.” Steagald, 101 S.Ct. 1642, at n. 7.

. See also People v. Hernandez, 218 A.D.2d 167, 173-174, 639 N.Y.S.2d 423, 426 ("[T]he holding of Steagald (supra) protects only the homeowner whose premises are searched, not the suspect who is legally arrested on the homeowner's premises. (Citations omitted.) To hold otherwise would create the absurd situation in which a suspect .... has greater rights in someone else's home than in his or her own home. (Citations omitted.)”)

. Defendant's mother did testify at the September 14, 1990 hearing; however, she was not asked any questions regarding the location of her son's principal residence.

. Although the trial court found that Knight’s mother consented to the search, the testimony concerning this issue was less than comprehensive. Det. Byron Adams testimony was as follows; "We informed his parents why we *1201 were there and wanted to know if in fact we could look in the residence for him. She said that he was not there and that we could come in.” However, Adams further testified that the mother signed a consent to search prior to any officers entering the dwelling. Adams was almost positive of this point, but he conceded that Det. Fascio handled the consent to search. Adams also testified that he was not the first to enter the dwelling, and that other detectives entered a few minutes before he did. Det. Fascio testified that the consent to search was not signed until after they had found the defendant and the shotgun. The only evidence recovered as a result of the consent form were two shotgun shells. Tricia Cook, defendant’s mother, testified that after one of the officers cocked a pump gun on her, she was told to step back. Id. at p. 24. Although the trial court apparently found Det. Adams testimony the more credible, the fact that he entered the dwelling a few minutes after other officers leads one to question whether his testimony was based on first hand knowledge.