A04A0174. VAN ALSTINE v. THE STATE.
(602 SE2d 264)

BLACKBURN, Presiding Judge.

Following a bench trial and the subsequent denial of his motion for new trial, James Edward Van Alstine appeals his conviction for trafficking in methamphetamine, contending that the trial court erred by denying his motion to suppress. Because we hold that the trial court correctly concluded that the drug was properly seized, we affirm.

When reviewing a trial court's order denying a motion to suppress evidence, we are guided by three principles:

> First, when a motion to suppress is heard by the trial judge, that judge sits as the trier of facts. The trial judge hears the

---

[24] *In the Interest of B. C. G.*, 235 Ga. App. 1, 5 (2) (508 SE2d 239) (1998).
[25] *State v. Stokes*, 185 Ga. App. 718 (365 SE2d 477) (1988).

evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support it. Second, the trial court's decision with regard to questions of fact and credibility must be accepted unless clearly erroneous. Third, the reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment.

(Citations, punctuation and emphasis omitted.) *Tate v. State.*[1]

So construed, the evidence shows that deputies were searching for a fugitive wanted on several warrants. While assisting these deputies, an informant saw a truck and its driver and told the deputies that the driver of a truck was the fugitive they were seeking. Based on this information, the first investigating deputy approached the truck to conduct a *Terry* stop. The truck's driver stepped out, identifying himself as James Van Alstine (the fugitive's brother) and gave the deputy his driver's license. Although this appeared to be correct, the first deputy decided to have a second deputy (more familiar with the fugitive) come over to confirm the driver's identity.

The second deputy asked the driver to confirm his identity. When the driver repeated to the second deputy that he was the fugitive's brother, the deputy "at that point . . . saw a knife in his pocket." The deputy described the knife as follows: "It was a clip knife. It had a little clip on it where they stick it on the side of their pocket to hold it."

The second deputy then asked the driver if he had any knives or guns on his person, to which the driver answered no. Concerned about this fabrication and about his own safety, the second deputy asked the driver to remove all items from his pockets. When the driver nervously attempted to hide something in his waistband rather than comply, the deputy pushed him against the truck and ordered him not to move. The driver attempted to flee and was caught and forced to the ground, where the deputies found suspected methamphetamine under him when he rolled over. This resulted in the driver's arrest and the search of his truck, which contained trafficking amounts of methamphetamine.

Based on this evidence, the trial court denied Van Alstine's motion to suppress the methamphetamine, finding that his stop and search were proper under *Terry*. Van Alstine now challenges this ruling, contending that: (1) the first deputy had no right to detain him after he told him that he was not the fugitive sought by police, and (2) the second deputy had no grounds to search him. Viewing the

---

[1] *Tate v. State*, 264 Ga. 53, 54 (1) (440 SE2d 646) (1994).

evidence in the light most favorable to the trial court's denial of Van Alstine's motion to suppress, as we must, these contentions are erroneous.

1. Van Alstine contends that, after he showed his driver's license to the first deputy and told him he was not the fugitive, the first deputy no longer had any reason to detain him. The trial court found that, at the time the first deputy asked for the second deputy's assistance in determining whether Van Alstine was the fugitive, the deputies "weren't sure that [the fugitive] was not there and apparently didn't trust the people they were talking to and continued to stabilize the premises." The first deputy's testimony supports the trial court's finding, as he stated that he turned Van Alstine over to the second deputy because he "had more knowledge of who we were looking for." Because this testimony supports the trial court's finding, we must accept it, just as we would be required to accept the factual finding of a jury. *Tate*, supra.

Van Alstine would have us scrutinize the record to reach a different conclusion. But any arguments to the contrary based on portions of the record less favorable to the trial court's ruling have no bearing on this case at the appellate level and cannot change the result. Therefore, the testimony that it may have been apparent to those other than the first deputy that Van Alstine was not the fugitive does not alter the outcome here and, indeed, pursuant to our appellate standard of review, cannot appropriately be considered in reaching our conclusion.

2. Van Alstine also contends that the methamphetamine he was found carrying must be suppressed because the second deputy had no right to search him. Specifically, Van Alstine argues that the second deputy only saw a clip attached to his pocket, and that it was unreasonable for the second deputy to fear that he was carrying a weapon. Again, following our standard of review, this contention lacks merit.

Viewed in the light most favorable to the trial court's ruling, the transcript shows that the second deputy expressly testified, "I saw a knife in his pocket." Immediately thereafter, the second deputy explained that he recognized it as a clip knife with "a little clip on it where they stick it on the side of their pocket to hold it." Based on this testimony, the trial court, after judging the second deputy's credibility and considering the type of knife under consideration, expressly found that the deputy "saw the knife." As there was certainly some evidence to support this finding, we must accept it.

Van Alstine's arguments based on countervailing evidence does not alter the result here. Although he argues vociferously that the

second deputy could not have recognized that he had a clip knife in his pocket based on his observation of the attached clip, the trial court found otherwise.

Because we are required to affirm the trial court's fact findings "if there is any evidence to support [them]," (punctuation omitted) *Tate*, supra at 54 (1), we affirm the trial court's findings as to (a) the first deputy's desire to confirm his preliminary conclusion by having the second deputy briefly continue the interrogation of the driver and (b) the second deputy's seeing the knife and attempting to protect himself. We therefore affirm the trial court's ruling denying the motion to suppress.

*Judgment affirmed. Andrews, P. J., Eldridge and Adams, JJ., concur. Ruffin, P. J., Barnes and Mikell, JJ., dissent.*

BARNES, Judge, dissenting.

Because the police lacked reasonable suspicion which warranted Van Alstine's further detention beyond that necessary to ascertain that he was not the fugitive they were seeking, and also lacked reasonable suspicion that he was armed and dangerous, his continued detention and search was illegal, and I must respectfully dissent.

To fully appreciate the context of the search at issue in this case, it is necessary to offer some background surrounding the officers' activities preceding their encounter with Van Alstine. This case began as a search by deputies from the warrant/fugitive division of the Forsyth County Sheriff's Office for *Jeff Van Alstine*, the brother of James Van Alstine, the appellant in this case. The record contains no information showing that the deputies suspected James Van Alstine of *any* criminal activity.

Jeff Van Alstine was wanted on "approximately twelve to fourteen different warrants." We do not know the specific charges involved or any of the details contained in the arrest warrants because they were never made a part of the record of this appeal. Although from the deputies' conduct one might assume that Jeff Van Alstine was wanted for capital crimes, this does not appear to be the case. One of the deputies testified that the warrants were for obstruction of an officer, possession of a firearm during the commission of a felony, fleeing and attempting to elude in a stolen vehicle, and "there may have been a Theft by Taking — a Felony Theft by Taking."

At the motion to suppress hearing, James Van Alstine presented evidence of three earlier searches the deputies conducted for his brother in the month before the May 11, 2002 search. The first occurred on April 4, 2001, at a home in Gilmer County. Although first stating that an informant told him that Jeff Van Alstine would be there, the deputy finally testified that they got the address from the arrest warrant. The deputies did not have a search warrant for the

home. The deputies went to the home at night, found no one would answer the door, and waited outside the home during the early morning until about 5:00 a.m. when a television came on inside. The deputies knocked, but again no one answered. Then, with no idea of who might be in the home, a member of the SWAT team accompanying the deputies threw a "flash-bang" grenade inside and they entered the home. The home was empty and the television was on an automatic timer.

Next the deputies searched a home in Pickens County. The only evidence in the record about this search was that the deputies went to the front and back of the house and did not find Jeff Van Alstine, but discovered marijuana growing in the backyard.

The search immediately before the one at issue occurred in late April 2001 at James Van Alstine's home in Cherokee County. Two squad cars of deputies went to the home and James Van Alstine's wife voluntarily admitted them into the home. The wife testified that deputies searched other areas of her property, including the crawl-space under the home, without her permission.

The trial court considered the evidence of the three earlier searches in deciding the motion to suppress as evidence of "what went on in other — other locations." It found that because the residence in Pickens County was identified as that of the fugitive, "they could go there without a search warrant. They could go there in execution of the [arrest] warrant. They were lawfully there on the premises." But see *Steagald v. United States*, 451 U. S. 204 (101 SC 1642, 68 LE2d 38) (1981) (an officer with an arrest warrant has no right to enter the home of a third party without a search warrant, absent consent or exigent circumstances). The trial court's only comment regarding the search of Van Alstine's residence was that, "[t]o the extent there was access there — excess there, then maybe that's something the court should consider in determining what happened here and I think I'll do so."

The evidence shows that on May 11, 2001, four deputies were again searching for Jeff Van Alstine. An informant told the deputies that he knew of three possible locations for Jeff where he had purchased methamphetamine from him. One of the locations was the garage at issue, and was believed to be James Van Alstine's residence or business in Cherokee County. Thus, even though they were searching for Jeff Van Alstine, the deputies knew that James Van Alstine either resided or operated a business at that location, and he might be present.

The deputies were in two automobiles, with two deputies in each patrol car. They had a photograph of Jeff to help identify him. The informant was in the back seat of one of the cars directing the deputies to the location.

The deputies devised a plan to approach the building "two to the rear and two to the front," making sure that everybody was gathered to the front, and, to "gather all persons around the area to make sure, for deputies' safety reasons, nobody has any guns or weapons, and I.D. the individuals to see if one of them was Jeff Van Alstine." They "were going to secure the location and attempt to get Jeff Van Alstine — the person that we thought was Jeff Van Alstine — and if it wasn't him, we were going to I.D. everybody that was there." The deputies blocked the driveway with one of their cars so that no one could leave, and no one was permitted to do so once they entered the garage.

Two of the deputies brandished shotguns when they went on the premises. The plan was for two deputies to go to the rear of the building where a tow truck was located, one to approach a nearby camper, and the last deputy to confront the person in the truck.

A deputy went to the camper, knocked on the door, asked the man who answered for I.D., and took him to the front of the garage where the other deputies had gathered all of the other persons who were present on the property. Another deputy carrying a shotgun approached several people who were merely working on the tow truck at an *adjacent* property, made them stop what they were doing, ordered them out of the garage, asked for I.D., asked them to empty their pockets and place their hands on the truck they were working on. The deputy said that he did not recall if his weapon was pointed at these people.

Another deputy approached Van Alstine's truck, and the driver stepped out, identified himself as James Van Alstine, and gave the deputy his driver's license. Van Alstine told him that they were looking for his brother. The deputy testified that the photograph on the driver's license confirmed who Van Alstine was, but since another deputy "had more knowledge of who we were looking for," he waited with Van Alstine for about two minutes until the other deputy arrived and gave that deputy the driver's license.

The first deputy said that at the time he turned Van Alstine over to the other deputy he was satisfied that Van Alstine "wasn't the fugitive." The deputies knew that Jeff Van Alstine had a brother. Another deputy testified that even from a distance of ten feet away he could tell immediately the man was not Jeff Van Alstine. It was readily apparent to this deputy that the face on the photographs they had of Jeff did not "match that gentleman's face." Based on this evidence, the trial court concluded that the deputies knew immediately that James Van Alstine was not the man they were looking for.

The deputy who came over to question Van Alstine testified that "[i]t's possible" that he had a shotgun. He testified that he conducted a "field interview" and he was "just making sure it wasn't Jeff with a

different name variation on it," and that Van Alstine had "immediately advised [him], 'I'm James Van Alstine. I'm his brother.' " The deputy testified that at that point he saw "a knife in [Van Alstine's] pocket." He later testified, however, that it was a clip knife. On direct examination the deputy testified that "[i]t had a little clip on it where they stick it on the side of their pocket to hold it up. And, just for officer safety reasons, my normal procedure is, I always — when I see that, I ask the individual do you have any weapons on you — any knives or guns," and Van Alstine replied no.

But, during cross-examination, the deputy testified that he did not ask if Van Alstine had any weapons. He only said "guns or knives." The deputy testified that "the knife was in the pocket and the clip was outside." Only the clip was visible.

The deputy testified he became suspicious because Van Alstine answered no to the weapons questions while the deputy was "looking at one [a weapon], so I asked if he wouldn't mind removing all the items out of his pockets." Van Alstine acted "extremely nervous" and turned his body away from the deputy and put his hand in his left pocket. The deputy testified that it looked "like he was stuffing something in his back waistband." The deputy pushed Van Alstine against the truck and ordered him not to move, but Van Alstine pulled away and attempted to run. Van Alstine was stopped, taken down, and handcuffed. As the deputies rolled him over for a pat-down, they spotted a "clear bag with some white or brown substance in it." The deputies secured the area and called for assistance from Cherokee County and advised them that "we had suspected methamphetamine on the scene."

The deputies then searched Van Alstine's truck and found a partially opened briefcase behind the passenger's seat containing scales, money and "a trafficking amount" of methamphetamine. A narcotics deputy with the Cherokee County narcotics squad arrived and, after questioning Van Alstine and receiving consent, conducted a search of the building. After he recovered "marijuana residue and shakings," he terminated the search and obtained a search warrant. When the deputies executed the search warrant, they found more marijuana and methamphetamine. Van Alstine was charged with two counts of trafficking methamphetamine and one count of violation of the Georgia Controlled Substances Act.

In granting in part and denying in part Van Alstine's motion to suppress, the trial court found that "the evidence that was found on him and in the vehicle as a result of the search is — is valid and not suppressed." The trial court held that the initial entry on the premises was valid as a "knock and talk" and also because of exigent circumstances — the informant in the car who told the deputies that Van Alstine was the one they were looking for. He further determined

that while there was "excess probably," and the deputies probably "went a little beyond where they were supposed to with their shotguns and other things,"

> [i]n my opinion, their discussion and talk with Mr. Van Alstine was appropriate to try to find out where Jeff Van Alstine was. They had not been ordered from the premises. That is a first-tier encounter as far as I can see. Somewhere along the line when people go around — go around to the back door and start bringing people around with shotguns, it becomes more than first-tier.

> The officer had a right, under those circumstances, in my opinion, to do a *Terry* frisk. If he can frisk, then he can also command, which is less intrusive. He saw the knife. He could have frisked for the knife, frisked for any other thing on his premises. He told him to remove the knife. His testimony is that he asked him to remove other items.

"The ultimate test for the validity of the police's conduct . . . is whether, under the circumstances then confronting the police, their conduct was reasonable within the meaning of the Fourth Amendment." (Citation and punctuation omitted.) *Duvall v. State*, 194 Ga. App. 420, 421 (390 SE2d 647) (1990). United States Supreme Court holdings identify three tiers of police-citizen encounters: (1) communication between police and citizens involving no coercion or detention which do not implicate the Fourth Amendment, (2) brief seizures that must be supported by reasonable suspicion, and (3) full-scale arrests that must be supported by probable cause. *McAdoo v. State*, 164 Ga. App. 23, 26 (1) (295 SE2d 114) (1982).

> In the first [tier], police officers may approach citizens, ask for identification, and freely question the citizen without any basis or belief that the citizen is involved in criminal activity, *as long as the officers do not detain the citizen or create the impression that the citizen may not leave.* The second tier occurs when the officer actually conducts a brief investigative *Terry* stop of the citizen. In this level, a police officer, even in the absence of probable cause, may stop persons and detain them briefly, when the officer has a particularized and objective basis for suspecting the persons are involved in criminal activity.

(Citation and punctuation omitted; emphasis supplied.) *McClain v. State*, 226 Ga. App. 714, 716 (1) (487 SE2d 471) (1997).

The trial court's finding that this was a first-tier encounter is clearly erroneous. The evidence in this case plainly shows that the deputies brandished weapons, retained Van Alstine's driver's license, and detained him for questioning by two different deputies. First-tier encounters are "verbal communications involving no coercion or detention." *State v. Underwood*, 257 Ga. App. 893, 894 (572 SE2d 394) (2002). In first-tier verbal encounters, law enforcement officers may approach a citizen, "ask for identification, and freely question the citizen without any basis or belief that the citizen is involved in criminal activity, as long as the officers do not detain the citizen or create the impression that the citizen may not leave." *Mijares v. State*, 252 Ga. App. 804, 805 (2) (556 SE2d 927) (2001).

Instead, we find that the contact in this case was a second-tier encounter for which a reasonable, articulable suspicion of criminal activity was required. This was an investigative stop under *Terry v. Ohio*, 392 U. S. 1, 22 (88 SC 1868, 20 LE2d 889) (1968). "A *Terry* stop is a brief detention by an officer who suspects an offense is being committed or has been committed, for the purpose of clarifying or investigating the facts that gave rise to that suspicion. [Cits.]" *McKenzie v. State*, 208 Ga. App. 683, 684 (1) (431 SE2d 715) (1993).

And while the initial contact with Van Alstine was authorized, given the informant's identification of Van Alstine as the fugitive designated in the arrest warrant, and their reasonable suspicion authorizing his detention to determine whether he was Jeff Van Alstine, the evidence shows that the deputies knew very early in their questioning that Van Alstine was not the fugitive they were seeking. And, because the evidence supports it, this court must accept the trial court's finding that the deputies "immediately knew" that Van Alstine was not the man they were seeking. Therefore, with that knowledge the deputy no longer had a reasonable suspicion that would justify Van Alstine's continuing detention.

At that point, the contact should have de-escalated to a first-tier encounter, or the deputies should have ended their contact with Van Alstine and departed the premises. Since this did not occur, however, the deputy could lawfully only continue his investigation if he had some additional reasonable suspicion for continuing to detain Van Alstine. *Simmons v. State*, 223 Ga. App. 781, 782 (2) (479 SE2d 123) (1996). Here, the deputies continued to detain Van Alstine and began to question him about whether he possessed any weapons. Detention beyond that authorized for a *Terry* stop is an arrest that must be supported by probable cause. *Williams v. State*, 251 Ga. 749, 792 (8) (a) (ii) (312 SE2d 40) (1983).

Even though the arresting deputy testified that he noticed the clip of a clip knife on Van Alstine's pants almost immediately, the deputy's subsequent testimony clarifies that he did not see a knife,

but only a clip on the outside of Van Alstine's pocket. Apparently, no knife was recovered from Van Alstine's person because it was not introduced into evidence, and the record also does not contain the clip that the deputy saw. Contrary to the majority's assertion that there was some evidence supporting the trial court's finding that the deputy "saw the knife," I can find no evidence supporting that conclusion, which is therefore clearly erroneous.

That being so, we can only assume that the presence of the clip may have caused the deputy to believe that Van Alstine had a knife. Merely believing that Van Alstine had a knife in his pocket, however, does not create a reasonable suspicion warranting further detention. Having a pocket knife is not a crime in this state, and the deputy has never contended that he suspected Van Alstine's knife was a concealed weapon.

The deputy's testimony indicates that he apparently always asks people in Van Alstine's situation to empty their pockets. This is not an authorized procedure under *Terry*, just as a pat-down under *Terry* is not authorized as a routine procedure. Moreover, even if we were to accept that the deputy was justified in believing that Van Alstine was armed and dangerous, under *Terry v. Ohio*, the deputy was only authorized to conduct a *frisk* to find the weapon. *Hodges v. State*, 217 Ga. App. 806, 808 (2) (460 SE2d 89) (1995). "[A] law enforcement officer, for his own protection and safety, may conduct a patdown to find weapons that he reasonably believes or suspects are then in the possession of the person he has accosted." (Citation and punctuation omitted.) Id. The pat-down must be limited in scope to this protective purpose, *Thompson v. State*, 230 Ga. App. 131, 133 (495 SE2d 607) (1998), and limited to the intrusion reasonably necessary to discover weapons, *State v. King*, 227 Ga. App. 466, 468 (489 SE2d 361) (1997). The officer must first pat-down and only intrude beneath the surface if he comes upon something which feels like a weapon. *Brown v. State*, 181 Ga. App. 768, 771 (1) (a) (353 SE2d 572) (1987).

The deputy was in no way authorized to ask Van Alstine to empty his pockets, conduct that constituted a full-blown, intrusive search. In this regard, the trial court also erred by determining that a command to empty one's pockets is less intrusive than a pat-down. As the trial court recognized, a command to empty one's pockets is the equivalent of a full search, and is not authorized by *Terry* until a pat-down has first been conducted and a weapon detected or some contraband located under the "plain feel" doctrine. See *Minnesota v. Dickerson*, 508 U. S. 366 (113 SC 2130, 124 LE2d 334) (1993).

Moreover, to the extent the trial court's conclusion is based on a finding that the deputy "commanded" Van Alstine to remove the knife, but merely asked him to remove the other items, I believe that finding is also clearly erroneous. The deputy did not command Van

Alstine to remove only the knife. Further, under the evidence in this case, it is immaterial whether Van Alstine was merely asked to remove the contents of his pockets. The deputy's testimony shows that when Van Alstine did not do what was "asked" as rapidly as the deputy desired, he was thrown up against the truck. Thus, the request was clearly a command.

A reasonable pat-down for weapons is justified for the police officer's protection only when he has reason to believe he is dealing with an armed and dangerous person. *Hodges v. State*, supra, 217 Ga. App. at 808 (2). Under the evidence in this case, however, there is no evidence that a reasonably prudent man would be warranted in the belief that his safety was in danger. See *Thompson v. State*, supra, 230 Ga. App. at 133. No deputy testified that he believed that James Van Alstine had done anything wrong, or that he was in any way dangerous. Furthermore, the evidence reflects that he cooperated with the deputies. Absent the clip, which may have been attached to a myriad of objects, there was nothing to substantiate any concern for the deputies' safety.

Additionally, two of the four deputies present were armed with shotguns, the deputies knew that Van Alstine was not the man they wanted, Van Alstine was not hostile toward the police, and none of the deputies testified that he felt at all threatened by the circumstances. While the deputy testified that he was suspicious because Van Alstine said no when he asked him if he had "any weapons on [him] — any knives or guns," and "I'm looking at one [a weapon]," it is plausible that Van Alstine did not have a knife attached to the clip, or did not consider the "clip knife" a weapon. Up to that point, Van Alstine gave no indication of possessing a weapon, and as mentioned before, made no threatening gestures or other actions indicative of an assault. In short, there are no articulated facts that would have justified a police officer at the scene to suspect that Van Alstine was armed and dangerous. Any suspicious behavior on Van Alstine's part became apparent only after he was asked to empty his pockets.

Because the police lacked reasonable suspicion which would warrant further detention and also lacked reasonable suspicion that Van Alstine was armed and dangerous, Van Alstine's continued detention and subsequent search were illegal. Accordingly, any contraband the police deputies found because of Van Alstine's continued illegal detention and the illegal search should have been suppressed. *State v. Swords*, 258 Ga. App. 895, 896 (575 SE2d 751) (2002). Therefore, I respectfully dissent.

I am authorized to state that Presiding Judge Ruffin and Judge Mikell join in this dissent.

*John A. Nuckolls*, for appellant.

*Garry T. Moss, District Attorney, Scott T. Poole, Assistant District Attorney*, for appellee.