STATE OF MAINE                                    SUPERIOR COURT
PENOBSCOT, ss.                                    CRIMINAL ACTION
                                                  Docket No. CR-06-104
                                                  TJW -PEN- 3/15/2007

STATE OF MAINE,

        v.                              ORDER

LUIGI VALERIANO,

        Defendant.

FILED & ENTERED
SUPERIOR COURT
MAR 1 5 2007
PENOBSCOT COUNTY

Before the court is defendant's motion to suppress any evidence obtained in (1) a warrantless search at 10C Hobbit Way, Brewer, Maine, on January 31, 2006, (2) a subsequent search at 10C Hobbit Way later the same day pursuant to a search warrant, and (3) a search of defendant's person when he was thereafter arrested the following day at another location. A hearing on the motion was held on January 29, 2007.

Facts

On January 31, 2006 Officer Anthony Pinette of the Brewer Police Department went to 10C Hobbit Way in Brewer to serve a temporary protection from abuse order that had been issued the preceding day by the Bangor District Court (Murray, J.).

The person who obtained the order was Francine Ellis, who alleged that she had been subjected to verbal abuse and threats after she broke up with defendant Luigi Valeriano. Ellis's complaint for protection from abuse, sworn to January 30, 2006, also stated that Valeriano had kicked in her door. Her complaint asked the court to "give me possession of and order the defendant to leave immediately and not enter my residence located at: 10C Hobbit Way." A sworn statement signed by Ellis appended to the complaint further stated:

> 10C Hobbit Way is my place of residence, Luigi Valeriano is not welcome there and he needs to gather his cloths [sic] and leave.

The temporary order of protection was signed on January 30, 2006. In addition to prohibiting Valeriano from having contact with Ellis, it stated:

> The defendant is prohibited from entering the family residence or premises of the separate residence of the plaintiff at (list, unless confidential): 10C Hobbit Way, Brewer, Maine.

On a separate sheet providing information for purposes of service, Ellis had listed Valeriano's home address as 10C Hobbit Way, the same as her own address.

When Officer Pinette arrived at 10C Hobbit Way, he had a copy of the court's order, the complaint, and the service sheet. He knocked on the door, but there was no response. Nevertheless, he could hear movement inside. He also noticed that there was a security camera on the front step pointed at him. The front door had a sidelight, and Pinette looked through the sidelight to see if he could ascertain the source of the movement he could hear inside. He could see Valeriano (whom he recognized from an earlier noise complaint) standing in the hallway looking at him. Although Pinette then called out "Brewer Police, come to the door," the door remained closed. At that point Pinette called for backup. He could see at least two people in the apartment – Valeriano and another male – moving to and from the hallway and other rooms in the apartment.

Two other officers arrived. One was sent around to the back and reported that he could hear movement upstairs. The other, Sgt. Martin, joined Pinette at the front door and considered the situation. Pinette had already tried the phone number given for Francine Ellis on the complaint from protection and learned it had been disconnected. Martin asked Brewer dispatch, without success, to attempt to get a phone number for Valeriano or for the apartment. At this point, Martin and Pinette were

2

concerned that Valeriano and the other people in the apartment, although aware of the police presence, were not answering the door and were instead "attempting to conceal or destroy something." Warrant Affidavit (State's Exhibit 1) at 4. They were also concerned that they could not reach Ellis and feared she might be inside the apartment and that her safety might be in danger.

Sgt. Martin disconnected the security camera and then began pounding on the door, stating, "Brewer Police. Protection order. Make yourself known." He tried the doorknob and found that the door was unlocked but when he tried to open it, he found it was blocked by a wooden pallet that had been propped against it. Martin pushed over the pallet, which gave way, and Martin and Pinette entered the apartment, moving slowly down the hallway to locate Valeriano and any other people inside. Martin continued to call out, "Brewer Police. Protection order. Make yourselves known." At that point Valeriano and one other person called out from the basement that they were coming up.

When Valeriano and the other person emerged, they were handcuffed "for officer safety" and Sgt. Martin and Officer Pinette went down into the basement to check the area. They were looking for other persons who might present a threat to the safety of the officers, and they were looking to see if Ellis was in the apartment as they were concerned for her safety. Because the actions of Valeriano and others had made them suspicious that something was in the apartment that Valeriano did not want the officers to see, they were also looking for the reason for that behavior.

When Sgt. Martin went to the basement, he went to the center of the basement to get a clear view of the entire room. Looking down, he saw a hole for a sump pump and noticed that several bottles, which looked like pill bottles, were floating in the hole. Returning upstairs, Sgt. Martin noted a strong odor of marijuana, noted that the

3

security camera he had disconnected was connected to a TV screen on the first floor, and opening a closet, saw a marijuana bong. Upstairs, even though Valeriano had said no one else was present, the officers found two adult males and a juvenile female.

Valeriano's fanny pack was searched, but the officer who searched it did not testify at the hearing and the State conceded at the hearing that it could not sustain a security search of the fanny pack absent evidence from the officer in question.

Sgt. Martin then returned to the basement and retrieved and inspected the bottles he had seen floating in the sump pump hole. At that time he saw that the labels of the bottles were not saturated with water, that the bottles were for prescription drugs, and that the prescription labels indicated they had been filled by a Las Vegas pharmacy. According to the labels, two of the bottles were for oxycontin and one for alprazolam.[1]

Based on what was found in Valeriano's fanny pack, Sgt. Martin made further inquiries which resulted in the arrest of Valeriano for unlawful possession of methadone. Although the officers had originally thought that Valeriano's presence in the apartment constituted trespassing, Valeriano advised them that his name was on the lease and that (except for the protection order) he had a right to be there.

At that point, Sgt. Martin went to apply for the search warrant, which was entered into the record as part of State's Exhibit 1.

Discussion

The first issue is whether the entry of Sgt. Martin and Officer Pinette into the apartment violated the Fourth Amendment. Under the specific circumstances presented, this is an issue of considerable complexity. On the one hand, based on what

---

[1] Sgt. Martin also testified that the bottles were the kind of bottles used by pharmacies for storage of pills, and he had not previously seen such bottles given out by pharmacies to prescription holders. As far as he knew, however, the prescriptions were lawful.

they had observed and based on the protection order and affidavit that Pinette had been attempting to serve,

(1) the officers knew Valeriano was inside the apartment, that he was aware of their presence, and that he would not come to the door or otherwise respond to their knocks and verbal requests;

(2) there was a court order prohibiting Valeriano from entering 10C Hobbit Way;

(3) the protection order was based on an affidavit stating that Valeriano had kicked in a door and had threatened violence against Francine Ellis; and

(4) Francine Ellis's affidavit stated that 10C Hobbit Way was her residence and that Valeriano was not welcome there.

Thus the protection order gave the police a reasonable basis to conclude that Valeriano should not remain on the premises and that they were entitled to serve Valeriano with the order and escort him from the premises. The police also had probable cause to believe that Valeriano was committing the Class D offense of criminal trespass in their presence, and they could have been arrested him on that charge without a warrant.[2]

On the other hand, although they cannot be faulted for being concerned about Ms. Ellis's safety, the officers did not have probable cause to conclude that she was in the apartment or that there was any situation in the apartment that presented a potential emergency threatening the safety of Ms. Ellis or any other person. Moreover, it does not appear that the officers had the right to enter Valeriano's residence (even though they did not know at that time that 10C Hobbit Way was his residence) to arrest him for trespassing in light of the U.S. Supreme Court's decisions in Payton v. New

---

[2] See 17-A M.R.S. § 15 (1)(B). They did not have probable cause to conclude that Valeriano had violated a protective order see id. § 15 (1)(A)(13), because he had not yet been served with the order. Once Valeriano was able to demonstrate that he was on the lease, they no longer had probable cause to conclude that he had committed criminal trespass but they had not learned that at the time they first entered the apartment.

York, 445 U.S. 573 (1980), and <u>Steagald v. United States</u>, 451 U.S. 204 (1981). <u>Payton</u> held that an arrest warrant is required to enter a suspect's own residence in order to arrest him on felony charges. 445 U.S. at 603. <u>Steagald</u> held that even where an arrest warrant has been issued, a search warrant is necessary in order to enter the residence of a person other than the person named in the arrest warrant. 451 U.S. at 220, 222. In this case the officers had neither a search nor arrest warrant.[3]

The officers' right to enter 10C Hobbit Way, therefore, turns on whether the Fourth Amendment permitted them to enter the apartment to serve a protection order forbidding Valeriano to remain on the premises. On that issue the court has found no precedent. Defendant argues that a protection order should be served the same as any other civil process, and there is no basis for a warrantless entry to serve a protection order. As a matter of policy, however, the court finds this to be a close question. Where the court has signed an order barring Valeriano from the property, it is anomalous to suggest he has a right to keep the officers from entering the property to serve that order. Moreover, given the importance of protection orders to prevent domestic violence, there is an important public interest in having those orders served and enforced promptly.

For purposes of argument, the court will assume – without deciding – that the initial entry was justified and that the need to serve a protection order and the particular terms of that order added a degree of exigency allowing a warrantless entry in this case. Moreover, if they lawfully entered the premises, the court would conclude that the officers were thereafter justified in undertaking a protective sweep of the premises. See <u>United States v. Jiminez</u>, 419 F.3d 34, 40-42 (1st Cir. 2005); <u>United States</u>

---

[3] If law enforcement officers need an arrest warrant to enter someone's residence to make a felony arrest, it is hard to argue that they should be held to a lesser standard when making a misdemeanor arrest.

v. Martins, 413 F.3d 139, 149-50 (1st Cir. 2005). However, even under this assumption, the State has not met its burden of justifying the warrantless search undertaken by Sgt. Martin in this case. A protective sweep permits only "a cursory inspection of those spaces where a person may be found." Martins, 413 F.3d at 149, quoting Maryland v. Buie, 494 U.S. 325, 335 (1990). In this case the officers did not limit themselves to looking into spaces where a person presenting a danger to the officers might be found. In particular, looking into the sump pump hole went beyond any search that would have been reasonable to locate potentially dangerous persons.[4]

Understandably, Sgt. Martin was intrigued and suspicious because, as he stated in the warrant affidavit, it appeared from outside that Valeriano and another individual were "attempting to conceal or destroy something." This caused Sgt. Martin to undertake a search that went beyond a protective sweep. The information thereby gained, however, must be suppressed because, even assuming that Sgt. Martin had authority to enter the premises, he needed a warrant to go beyond a protective sweep.

At the hearing the State contended that the smell of marijuana – testified to by both Sgt. Martin and Officer Pinette – would alone have been sufficient to justify the issuance of the warrant. The court disagrees. There was no evidence available to the officers that any marijuana use went beyond a civil violation, and the issuance of a search warrant must be justified by the potential presence of "evidence of a crime." M.R.Crim.P. 41(b)(1) (emphasis added).

The State acknowledged at the hearing that, if the initial entry was not authorized, all of the drug related evidence against Valeriano should be suppressed.

---

[4] Even if the court were to accept the contention that the bottles floating in the sump pump hole were in plain view, those bottles alone did not constitute probable cause for the later warrant. Sgt. Martin went further and returned and examined the bottles and their labels before seeking a warrant. This went beyond anything that could be justified as a protective sweep.

The same conclusion follows from the court's ruling that, even if the initial entry did not violate the Fourth Amendment, all of the information gained by Sgt. Martin from examining the sump pump hole and from the search of Valeriano's fanny pack should be suppressed. Because that information formed the basis for the subsequent search warrant, the evidence found in the search conducted under that warrant must also be suppressed. And because that information in turn formed the basis for Valeriano's arrest the next day, the evidence found in the search incident to that arrest must also be suppressed.

The entry shall be:

Defendant's motion to suppress is granted.

DATED: March _7_, 2007

Thomas D. Warren
Justice, Superior Court

8

State of Maine v. Luigi F. Valeriano
Penobscot County Superior Court CR-2006-104


District Attorney:

Michael P. Roberts, Deputy District Attorney
Office of the District Attorney
97 Hammond Street
Bangor, ME 04401

Telephone: 945-8552


Defense Counsel:

Jeffrey M. Silverstein, Esq.
RUSSELL SILVER & SILVERSTEIN
145 Exchange Street
Bangor, ME 04401

Telephone: 947-8244