J-S33028-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NICHOLAS R. BOYD CHISHOLM | : | |
| | : | |
| Appellant | : | No. 964 MDA 2016 |

Appeal from the Judgment of Sentence June 1, 2016
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s):  CP-22-CR-0006106-2014

BEFORE:   BENDER, P.J.E., OTT, J. and STRASSBURGER, J.[*]

MEMORANDUM BY OTT, J.:                    **FILED AUGUST 04, 2017**

Nicholas R. Boyd Chisholm[1] appeals from the judgment of sentence imposed on June 1, 2016, in the Dauphin County Court of Common Pleas. The trial court sentenced Boyd Chisholm to an aggregate term of three to seven years' imprisonment following his non-jury conviction of persons not to possess firearms, possession with intent to deliver ("PWID") marijuana, and possession of drug paraphernalia.[2]  On appeal, Boyd Chisholm contends

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Throughout the record, Boyd Chisholm's name appears both with and without a hyphen, *i.e.* Boyd-Chisholm.  We have chosen to address him using the spelling on his appellate docketing statement.

[2] 18 Pa.C.S. § 6105 and 35 P.S. §§ 780-113(a)(30) and (a)(32), respectively.

the trial court erred in denying his motion to suppress the evidence obtained following an illegal search of his residence. For the reasons below, we affirm.

The facts underlying Boyd Chisholm's arrest and conviction are summarized by the trial court as follows:

> The charges in this case stem from the Dauphin County Sheriff Department's attempt to serve an arrest warrant on Antonio Foster at 2435 Fourth Street, Harrisburg, PA.[3] Specifically, the warrant was for a domestic relations violation.
>
> … Terry Shipman of Dauphin County Domestic Relations Office (DRO) [testified] regarding the process of obtaining an arrest warrant for an individual. When a person owes child support and fails to appear for their court proceeding, a warrant is obtained. The initial part of the scheduling process is looking up the address that the DRO has on file. They receive addresses in different ways; sometimes from the individuals themselves, from the other party in the case, or a third party. Before it is used as a valid address, DRO verifies it with the United States Post Office that it is indeed a good address. A standard form, developed and utilized by the DRO, is printed out that includes the individual's name and address in question. The DRO sends that to the Postmaster for the particular postal jurisdiction and asks for verification of mail being delivered to that address. In this case, the DRO used the same address that was used for Mr. Foster's court notice, the same address that was provided to the Dauphin County Sheriff's Office. The address would have been verified with the United States Postal Service prior to sending out the notice for Mr. Foster's contempt hearing. Mr. Shipman testified that there was a note in the DRO computer system that in late April of 2014 Mr. Foster was the one who called in and self-reported his address (2435 Fourth Street). If the mail is not returned to the post office, there is an assumption that it was received.

---

[3] Foster is not involved in this appeal.

Daine Arthur of the Dauphin County Sheriff's Office also testified at the suppression hearing. Assigned to the Warrant Unit, Deputy Sheriff Arthur was given a Domestic Relations warrant for Antonio Foster, at the address of 2435 Fourth Street, Harrisburg, PA. Deputy Sheriff Arthur testified that he has executed hundreds of domestic relations warrants and that the addresses are very reliable. Deputy Sheriff Arthur executed the warrant on November 10, 2014. When he arrived at the address listed on the warrant, Deputy Sheriff Arthur took a position at the rear of the property with Corporal Darin Sherfey. Deputies Dean Sullivan and Brock Fasnacht stayed to the front of the residence. Deputy Fasnacht radioed Deputy Sheriff Arthur to come around front. Deputy Sheriff Arthur did so, and encountered [Boyd] Chisholm. He informed [Boyd Chisholm] that he had a warrant for Antonio Foster. [Boyd Chisholm] told Deputy Sheriff Arthur that Mr. Foster did not live there. At that point, Deputy Sheriff Arthur told [Boyd Chisholm] that the address on the warrant was the only one they had for Mr. Foster, and that they would have to do a walk-through to make sure Mr. Foster was not there. [Boyd Chisholm] again told the authorities that Mr. Foster doesn't live there, and that he never lived there. Deputy Sheriff Arthur also testified, "In my experience, a lot of times when people say that a certain individual doesn't live there, it's not always a hundred percent true," and that it frequently happens that individuals lie about someone being inside the house. Therefore, Deputy Sheriff Arthur explained again that the authorities had to do a check of the property to make sure Mr. Foster was not there. At that point, [Boyd Chisholm] was inside the house and the sheriffs were on the front porch. [Boyd Chisholm] stepped aside, said okay, and allowed Deputy Sheriff Arthur, and Deputies Fasnacht and Sullivan into the home.[4]

Upon entry into the property, [Boyd Chisholm] made the statement, "Please don't arrest me." When Deputy Sheriff Arthur asked why, [Boyd Chisholm] stated that he had weed upstairs in his room. [Boyd Chisholm] then led Deputy Sheriff

---

[4] We note the trial court did not enter a specific factual finding that Boyd Chisholm gave the officers his consent to search the home, and the Commonwealth does not contend that he did so.

Arthur to his room and pointed out the green leafy substance on his bed. The substance was packaged in clear plastic gallon bags, and there was loose leafy green material on a scale on a nightstand. Everything was in plain view. Deputy Sheriff Arthur radioed Dauphin County Dispatch informing them that he needed a city officer at his location. After the Harrisburg Police arrived, the officers did an additional search. Deputy Sheriff Arthur was not present for this. Deputy Sheriff Arthur also testified that [Boyd Chisholm] was very cordial, well-spoken, and not aggressive.

[] Boyd[]Chisholm also testified. He stated that when he opened his door, the sheriffs told him they had a warrant for Mr. Foster, to which he responded that Mr. Foster did not live there and they could not enter. [Boyd Chisholm] tried to shut the door, and one of the sheriffs put his foot inside the door and told [Boyd Chisholm] he had a warrant for him, and that they were coming in. [Boyd Chisholm] said that at that point, one of the sheriffs radioed for Deputy Sheriff Arthur to come around to the front. As soon as Deputy Sheriff Arthur started talking to [Boyd Chisholm], the officer who had his foot in the door walked into the home. [Boyd Chisholm] testified that he did not resist or fight him.

Trial Court Opinion, 11/15/2016, at 1-4 (record citations omitted).

Boyd Chisholm was subsequently charged with persons not to possess firearms, PWID, and possession of drug paraphernalia.[5] On April 1, 2015, he filed a pre-trial motion to suppress the evidence obtained during the search of his home, arguing the arrest warrant for Foster did not provide the police with sufficient justification to search his residence. The court conducted a suppression hearing on June 15, 2015, and entered an order on August 4, 2015, denying Boyd Chisholm's motion to suppress. The trial court later

_____

[5] A charge of firearms not to be carried without a license was later withdrawn by the Commonwealth. *See* 18 Pa.C.S. § 6106.

- 4 -

found Boyd Chisholm guilty of the aforementioned offenses following a non-jury trial conducted on March 21, 2016. On June 1, 2016, Boyd Chisholm was sentenced to a term of three to seven years' imprisonment for the firearms offense, and a concurrent term of one to five years' imprisonment for PWID. No further penalty was imposed on the count of possession of paraphernalia. This timely appeal follows.[6]

Boyd Chisholm's sole issue on appeal challenges the trial court's denial of his motion to suppress. Specifically, he argues "all of the evidence gathered, and subsequent statements made by him were 'fruit of the poisonous tree' as they were obtained as a result of an unlawful search and seizure[.]" Boyd Chisholm's Brief at 19.

Our standard of review is well-settled:

[An appellate court's] standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court] is bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where ... the appeal of

_____

[6] On June 22, 2016, the trial court ordered Boyd Chisholm to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Boyd Chisholm complied with the court's directive, and filed a concise statement on July 7, 2016.

the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to [ ] plenary review.

**Commonwealth v. Mason**, 130 A.3d 148, 151–152 (Pa. Super. 2015) (quotation omitted), *appeal denied*, 138 A.3d 3 (Pa. 2016).

As a general rule, absent limited exceptions such as consent or exigent circumstances, the police must obtain a warrant before searching a residence. **See Commonwealth v. Caple**, 121 A.3d 511, 517 (Pa. Super. 2015). Furthermore, the United States Supreme Court has held that an **arrest warrant** does not authorize the police to search the residence of a third party for the subject of the warrant. **See Steagald v. United States**, 451 U.S. 204, 205 (1981). In **Steagald**, **supra**, the Court explained:

> [W]hile an arrest warrant and a search warrant both serve to subject the probable-cause determination of the police to judicial review, the interests protected by the two warrants differ. An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from an unreasonable seizure. A search warrant, in contrast is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place, and therefore safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police.

**Id.** at 212-213. **See also Commonwealth v. Martin**, 620 A.2d 1194 (Pa. Super. 1993) (applying **Steagald**, **supra**). Nevertheless, the **Steagald** Court acknowledged that "an arrest warrant alone will suffice to enter a suspect's **own residence** to effect his arrest." **Steagald**, **supra**, 451 U.S.

at 221 (emphasis supplied). Relying on the latter principle, this Court has held that when the police have a reasonable, but mistaken, belief that the subject of the arrest warrant lives at a particular address, they may enter the residence to look for the subject without first obtaining a search warrant. *See Commonwealth v. Romero*, 138 A.2d 21 (Pa. Super. 2016), *appeal granted*, ___ A.3d ___, 2016 WL 7008642 (Pa. November 22, 2016) and *appeal granted sub nom* **Commonwealth v. Castro**, ___ A.3d ___, 2016 WL 6887380 (Pa. Nov. 22, 2016); **Commonwealth v. Muniz**, 5 A.3d 345 (Pa. Super. 2010), *appeal denied*, 19 A.3d 1050 (Pa. 2011); **Commonwealth v. Conception**, 657 A.2d 1298 (Pa. Super. 1995).

A brief discussion of the factual circumstances in these cases will be instructive. In **Steagald**, **supra**, a confidential informant informed a DEA agent that Ricky Lyons, a federal fugitive, could be reached at a particular phone number for 24 hours. After learning the address attached to the phone number, several agents drove to the residence four days later to search for Lyons. Two men, one of whom was the defendant, were standing outside. The agents searched them and determined neither was Lyons. A woman who answered the door of the residence told the agents that she was alone. However, the agents disregarded her claim, told her to place her hands on the wall, and proceeded to search the residence for Lyons. Lyons was not found, but the agents did recover cocaine. The defendant was subsequently charged with federal drug offenses. **See Steagald**, **supra**, 451 U.S. at 206.

The trial court subsequently denied the defendant's motion to suppress, which was based upon the agents' failure to obtain a search warrant before entering the residence. The Court of Appeals affirmed that ruling. However, the Supreme Court reversed, noting the arrest warrant for Lyons "did absolutely nothing to protect [the third party] petitioner's privacy interest in being free from an unreasonable invasion and search of his home." *Id.* at 213. The Court was concerned that without such a safeguard, the potential for abuse was significant: "Armed solely with an arrest warrant for a single person, the police could search all the homes of that individual's friends and acquaintances." *Id.* at 215. Furthermore, the Court recognized "an arrest warrant alone will suffice to enter a suspect's own residence to effect his arrest[,]" and exigent circumstances, such as hot pursuit, may still justify the warrantless entry of a home. *Id.* at 221.

Relying on *Steagald*, a panel of this Court in *Martin*, *supra*, found the trial court erred in denying the defendant's motion to suppress evidence recovered while the police were conducting a warrantless search of the defendant's home for a suspect who had "outstanding warrants." *Martin*, *supra*, 620 A.2d at 1195. The suspect's ex-wife, who lived in the same neighborhood, called the police after she observed the suspect's car parked in the neighborhood, and saw the suspect in the defendant's home. Although the defendant initially permitted the officers to enter her residence, she demanded they produce a search warrant when they asked to search for the suspect. The suspect was subsequently located in a hidden room, and

the defendant was later charged and convicted of hindering apprehension. *See id.* On appeal, a panel of this Court vacated the judgment of sentence and reversed the order denying the defendant's motion to suppress. Noting that "[n]either consent nor exigent circumstances exist in this case[,]" the panel explained: "In the present case, [] we are concerned with the Fourth Amendment rights of a third party for whom no warrant has been issued and thus *Steagald* is controlling." *Id.* at 1196.

However, as noted above, in subsequent decisions, this Court has declined to follow *Steagald* when the police have conducted a warrantless search of a residence under a reasonable, but mistaken, belief that it is the home of the suspect named in the arrest warrant. In *Conception*, *supra*, the police arrived at 701 West Wingohocking Street with an arrest warrant for two men, Marcus Rivera and Robert Vargas. Vargas' warrant listed the West Wingohocking residence as one of his three addresses. The defendant, who answered the door, told police she did not know either man, and refused to allow them to enter. However, they ignored her objection and forcibly entered the home, where they discovered marijuana in plain view, and Rivera hiding in the bathroom. *See Conception*, *supra*, 657 A.2d at 1299. On appeal from her convictions, including drug charges and hindering apprehension, the defendant argued the trial court erred in denying her pretrial motion to suppress. Specifically, she asserted that under *Steagald*, the police were required to obtain a search warrant before entering her home. *See id.* at 1300.

A panel of this Court disagreed, finding "factual dissimilarities" distinguished the case from *Steagald*. *Id.* In particular, the panel emphasized the arrest warrant for Vargas specified three addresses for him, one of which was the West Wingohocking residence. Moreover, one of the detectives testified he learned through "reliable information from the narcotics unit … that Rivera and Vargas were staying" at that residence, had been seen in the area, and one of them ran into that residence while being pursued by another officer. *Id.* Reiterating that an arrest warrant alone provides the police with the authority to enter the suspect's residence to arrest him, the panel concluded the testimony demonstrated that "the police officer had a reasonable and well-founded belief that 701 West Wingohocking was the residence of at least one of the fugitives[, and] stated so on his affidavit of probable cause for arrest warrant." *Id.* Accordingly, the panel concluded the trial court did not err in denying the defendant's suppression motion.

The facts in *Muniz*, *supra*, are similar. Agents from the U.S. Marshall Service and the Lancaster City police force descended upon the defendant's first floor apartment, looking for Timothy Baldwin, a violent fugitive. When the lead officer knocked on the door, he heard someone running up the stairs of the apartment. The officers identified themselves and entered the residence. The defendant stated Baldwin did not live there and gave the officers his consent to search for Baldwin. Although Baldwin was not found,

the officers recovered drugs and a handgun, which led to the defendant's arrest and conviction. *See Muniz*, *supra*, 5 A.3d at 346-347.

On appeal from his conviction, the defendant argued, *inter alia*, that the trial court erred in failing to suppress the evidence recovered during the warrantless search. Relying on **Steagald** and **Martin**, the defendant maintained the search was illegal because "the police's initial entry into [the] apartment … was predicated solely upon an arrest warrant for Timothy Baldwin, and not upon an arrest warrant for [the defendant] or a search warrant for the premises[.]" *Id.* at 349. However, a panel of this Court concluded the facts presented were more similar to those in **Conception**, in that "the authorities had a reasonable belief that the current address for Timothy Baldwin was 446 Fremont Street." *Id.* at 351. The panel explained that "testimony from a female at Baldwin's previous residence, a LexisNexis search/listing, and a statement from a co-resident in [defendant's] building, all corroborated the reasonable belief that Baldwin lived in (and could be found in) the apartment." *Id.* Further, the panel rejected the defendant's claim that the officers' belief was unreasonable because Baldwin's approved parole address was elsewhere, and the defendant's mother testified that she and the defendant lived there, not Baldwin. *Id.* Significantly, the panel also found it unnecessary to address the defendant's claim that his consent was involuntary. Indeed, the panel found no consent was required: "[S]o long as the authorities had reason to believe that the subject of the arrest warrant (Baldwin) lived in and could be found in the apartment, they had a

valid basis to search the apartment for the subject of that warrant." *Id.* at 352.

Most recently, in **Romero**, a panel of this Court concluded the trial court erred in granting the husband and wife defendants' motion to suppress based on a warrantless search. **Romero**, *supra*, 138 A.3d at 23. In that case, an arrest warrant was issued for Earnest Moreno, the brother/brother-in-law of the defendants, after he absconded from a halfway house. The warrant listed the defendants' address as Moreno's "most likely place of residence." *Id.* at 23. When parole agents executed the warrant and knocked on the door of the residence, one of the defendants allowed them to enter. The agents stated they were looking for Moreno, and one of the defendants told them Moreno was "not on the property." *Id.* The agents then proceeded to search for Moreno. The trial court specifically found that the defendants did not give the agents "expressed permission to search the property." *Id.* at 24 (quotation omitted). However, as the agents approached the basement, the defendants began to object. In the basement, the agents discovered numerous marijuana plants, firearms, and drug paraphernalia. The defendants were subsequently charged with drug offenses and possessing an instrument of crime. Both filed a suppression motion challenging the agents' warrantless search of the residence. **See id.** at 23-24. The trial court granted the motions.

On appeal by the Commonwealth, a panel of this Court reversed the order granting the defendants' suppression motions and remanded the case for trial. The panel held:

> Where authorities have a reasonable belief that the subject of an arrest warrant lives within a given premises, they can enter the home and arrest the suspect without a search warrant. **Commonwealth v. Muniz**, 5 A.3d 345 (Pa.Super.2010). **Compare Commonwealth v. Conception**, 441 Pa.Super. 539, 657 A.2d 1298 (1995) (where police listed address on arrest warrant as possible residence of one of two fugitives, no search warrant needed to enter third-party defendant's apartment) *with* **Steagald v. United States**, 451 U.S. 204, 214, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) (where authorities conclude fugitive may be inside premises, but is not believed to be resident of premises, arrest warrant for fugitive inadequate to justify search of third-party owner's residence). The validity of an arrest warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing magistrate. **Maryland v. Garrison**, 480 U.S. 79, 85, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987).

*Id.* at 25.

In considering the facts of the case before it, the panel recounted the lead parole agent's testimony regarding how he came to believe Moreno lived at the residence. The agent explained: (1) that address was listed on Moreno's most recent, expired, driver's license; (2) Moreno provided that address when he was arrested two years earlier; (3) Moreno provided that address to the rehabilitation center as his parole point of contact; (4) Moreno listed that address when he signed out of the center before he absconded; and (5) some of Moreno's family members lived at that address. *See id.* at 26. Despite this testimony, which the trial court found credible,

- 13 -

the court, nevertheless, granted the motions to suppress because some of the evidence was stale (*i.e.*, the driver's license and arrest address), and the Commonwealth presented no documentation to support the agent's remaining assertions (*i.e.*, records from the rehabilitation center). ***See id.*** at 27. The panel, however, concluded the parole agent's testimony alone was sufficient to establish, by a preponderance of the evidence, that the agent "reasonably believed that Moreno's last place of address was [the defendants'] home." ***Id.*** at 28. Accordingly, the panel held: "Because the arrest warrant for Moreno was valid, the authorities had the legal basis to enter [the defendants'] residence without a search warrant, despite the fact that Moreno was not inside the home."[7] ***Id.***

---

[7] We note the Pennsylvania Supreme Court appears poised to address this issue. It accepted review of the ***Romero*** decision, framing the issues as follows:

> (1) In view of ***Payton v. New York***, 445 U.S. 573 (1980), and ***Steagald v. United States***, 451 U.S. 204 (1981), did the Superior Court err in concluding that an arrest warrant for Earnest Moreno authorized entry into the residence of Angel Romero and Wendy Castro for the purpose of executing the arrest warrant?
>
> (2) Did the Superior Court apply an erroneous standard of review regarding the suppression court's finding of fact that the authorities did not have express permission to enter the residence of Angel Romero and Wendy Castro?

***Commonwealth v. Romero***, ___ A.3d ___, ___ 2016 WL 7008642, *1 (Pa. November 22, 2016); ***Commonwealth v. Castro***, ___ A.3d ___, ___, 2016 WL 6887380, *1 (Pa. Nov. 22, 2016). The oral argument is scheduled for September 13, 2017.

The question presented in the case *sub judice* is whether the deputies serving the arrest warrant for Foster acted upon a reasonable, albeit mistaken, belief that Foster was living at 2435 Fourth Street at the time they searched the residence. Boyd Chisholm argues that the facts of his case are analogous to those in **Steagald** and **Martin**. He maintains the "domestic relations capias for Foster 'did absolutely nothing to protect [his own] interest in being free from an unreasonable invasion and search of his home.'" Boyd Chisholm's Brief at 25, *quoting* **Steagald**, *supra*, 451 U.S. at 213. Further, he contends the "limited exception" to **Steagald**, set forth in **Muniz** and **Conception**, is inapplicable because in the present case, there was "no evidence of record indicating that the Sheriff had a reasonable belief to suspect that Antonio Foster lived at the Residence." **Id.** at 25, 27. Rather, Boyd Chisholm emphasizes, Deputy Arthur relied on information provided by domestic relations and "admittedly took <u>no</u> steps to verify that Mr. Foster lived at 2435 North 4th Street." **Id.** at 27-28 (emphasis in original). Furthermore, he maintains the deputy's actions were "even more egregious[], because Foster was out on bail and, in fact, on parole at the time the warrant was served" so that his "address could have been easily verified." **Id.** at 28. Accordingly, Boyd Chisholm argues the warrantless search of his home was illegal under **Steagald** and **Martin**, and all the evidence recovered therefrom, as well as his statements to police, must be suppressed. **See id.** at 29.

Conversely, the trial court concluded the present case is analogous to *Conception*, *Muniz*, and *Romero*, and opined:

Here, deputy sheriffs were executing a domestic relations warrant for Antonio Foster with an address of 2435 Fourth Street in Harrisburg, PA. That address was the only address listed on the warrant. Terry Shipman's testimony emphasized the measures taken to ensure the reliability of the addresses at Dauphin County Domestic Relations, and that the U.S. Post Office verified that [] Mr. Foster was having mail sent to 2435 Fourth Street. Mr. Shipman's testimony was bolstered by Deputy Sheriff Arthur's statements that, in his experience, the addresses on the domestic relations warrants he executes are reliable. He also explained that even though [Boyd Chisholm] denied that Mr. Foster lived there, it was common for people to lie about the presence of wanted persons. The testimony presented leads to the conclusion that the search of the 2435 Fourth Street address was appropriate and supported by a reasonable belief that Mr. Foster resided there. The deputy sheriffs reasonably relied on a warrant address they believed was dependable based on past experience. Pursuant to *Muniz*, *supra*, *Conception*, *supra*, *and Romero*, *supra*, the actions of the deputy sheriffs were reasonable and the search was proper.

Trial Court Opinion, 11/15/2016, at 5-6.

Upon our review of the record, the parties' briefs, and the relevant case law, we conclude the trial court's factual findings are supported by the record, and its legal conclusions are correct. Through the testimony of Shipman, the Commonwealth established the steps the DRO took to substantiate the address for Foster, which included verification from the postal service that Foster received mail at the residence. *See* N.T., 6/15/2015, at 9-11, 15-16. Moreover, prior to that corroboration, the DRO's computer system indicated Foster had called the office and **self-reported** the Fourth Street address on April 24, 2014. *See id.* at 17. Accordingly,

- 16 -

when the DRO obtained Foster's arrest warrant and listed the Fourth Street address, it relied upon information provided by Foster himself, which was subsequently verified by the postal service.

Furthermore, the Commonwealth also presented the testimony of Deputy Sheriff John Stoner, who works in the warrant office and "deal[s] primarily with the Domestic Relations warrants." *Id.* at 27. Deputy Sheriff Stoner testified that he scans the warrants into a county file, and attaches a photograph of the suspect from the Pennsylvania Department of Transportation ("PennDOT") website. *See id.* He stated he does not "have any problems" with the accuracy of the addresses listed on the DRO warrants. *Id.* at 28. Moreover, Deputy Sheriff Stoner explained that even if the suspect's PennDOT address was different than that listed on the warrant, he would "go with the address that was on the warrant … because [he's] told that the folks in Domestic Relations do the research and that address … is the most current address." *Id.* at 30. Deputy Sheriff Arthur, who executed the warrant in the present case, confirmed that the DRO warrants are "very" reliable.[8] *Id.* at 35.

_____

[8] Under cross-examination, Deputy Sheriff Arthur stated the warrant unit does conduct an independent investigation when it receives an arrest warrant and "sometimes" uncovers other addresses for the suspect. N.T., 6/15/2015, at 44. He did not indicate whether the unit had uncovered any additional addresses for Foster.

Consequently, under the facts presented herein, we find no error on the part of the trial court in determining the Commonwealth established, by a preponderance of the evidence, the deputy sheriffs had a reasonable belief that Foster lived at the Fourth Street residence. *See Romero*, *supra*; *Muniz*, *supra*; *Conception*, *supra*. In both *Steagald* and *Martin*, the police were acting upon information that the suspect may be at a third-party's address for a period of time. Here, the deputies believed Foster **lived** at the Fourth Street residence. The fact that Foster provided a different address on a bail bond he signed on April 7, 2014 – more than two weeks **before** he self-reported the Fourth Street address on April 24, 2914 – is of no moment. *See* N.T., 6/15/2015, at 22. The deputies had reason to believe the Fourth Street residence was **one of the addresses** where Foster could be found. *See Muniz*, *supra*, 5 A.3d at 352 (finding officers had reasonable belief suspect would be at residence despite fact his "approved parole address" was in another city); *Conception*, *supra*, 657 A.2d at 1299 (police had reasonable belief that suspect may be at address even though residence searched was "one of [suspect's] three addresses" listed on warrant). Accordingly, no relief is warranted.

Because we conclude the sole issue Boyd Chisholm raises on appeal is meritless, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/4/2017