IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 14, 2019 Session

## STATE OF TENNESSEE v. SAMANTHA GRISSOM SCOTT

**Appeal from the Circuit Court for Warren County
No. 18-CR-1805    Larry B. Stanley, Jr., Judge**

_____

### No.  M2018-01852-CCA-R3-CD
_____

The Defendant, Samantha Grissom Scott, pleaded guilty in the Circuit Court for Warren County to possession with the intent to deliver more than twenty-six grams of methamphetamine and to possession of drug paraphernalia.  *See* T.C.A. §§ 39-17-434 (2018) (possession with the intent to deliver methamphetamine), 39-17-425 (2018) (possession of drug paraphernalia).   The trial court sentenced the Defendant to an effective eight years and ordered her to serve 180 days' confinement with the remainder on probation.  On appeal, the Defendant presents a certified question of law regarding the legality of the warrantless entry into her home.   We dismiss the appeal because the certified question is not dispositive of the case.

### Tenn. R. App. P. 3 Appeal as of Right; Appeal Dismissed

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined.  CAMILLE R. MCMULLEN, J., filed a dissenting opinion.

Brent Horst, Nashville, Tennessee, for the appellant, Samantha Grissom Scott.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Lisa Zavogiannis, District Attorney General; and Matt Colvard, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This case relates to the seizure of the Defendant and search of her home on December 20, 2017.   Warren County Sheriff's deputies were dispatched to the Defendant's home at the request of the White County Sheriff's Office to look for Ronnie Dishman, who was the Defendant's stepbrother and who had multiple outstanding arrest warrants from White County.   When the deputies arrived at the home, they saw an unknown male, who was later identified as codefendant Scott Bell, enter the home.

Deputies saw the Defendant inside the home, as well. The deputies set up a perimeter around the home, and the Defendant and codefendant Bell were detained when they left the home approximately thirty minutes later. The Defendant provided the deputies with written consent to search the home to search for Mr. Dishman. Upon searching a bedroom for Mr. Dishman, the police saw a bag containing a "crystal substance" that later field-tested positive for methamphetamine. The deputies obtained a search warrant for the home, which resulted in the seizure of additional methamphetamine from a washing machine. The Defendant was charged with various drug-related offenses. She filed a motion to suppress the evidence found inside the home on the basis that her consent to search was the product of an illegal entry, illegal search, and coercion.

At the suppression hearing, Warren County Deputy Tyler Glenn testified that the White County Sheriff's Office requested that the Warren County Sheriff's Office attempt to find Mr. Dishman, whom the White County Sheriff's Office believed was armed with a handgun or rifle, at the Defendant's home. Deputy Glenn said that he relied solely upon the information provided by the White County Sheriff's Office that Mr. Dishman would be at the Defendant's home and that he did not conduct an independent investigation to verify the information. Deputy Glenn said that he and five additional deputies drove to the Defendant's home and that everyone was armed with "long arms," which he described as shotguns, because many homes in the area had long driveways and open fields and that "a pistol is not something you want to have . . . if you get into a shootout." Deputy Glenn said that "pretty much everyone" in Warren County owned a rifle or shotgun.

Deputy Glenn testified that he and the deputies parked in the Defendant's driveway and that Deputy Derek Bowles saw a man, whom Deputy Bowles believed was Mr. Dishman, standing on the porch. Deputy Glenn said that the man looked at Deputy Bowles, entered the home, and locked the door and that Deputy Bowles ran to the door. Deputy Glenn said the deputies surrounded the home. Deputy Glenn said that he could see into the home through a glass front door, that he saw "several subjects running throughout" the home, and that the deputies gave commands for the people inside the home to come outside with their hands up because they were "surrounded." Deputy Glenn said that after about thirty minutes, the Defendant came outside and walked backward toward Deputy Bowles, who placed the Defendant in handcuffs.

Deputy Glenn testified that after the Defendant was placed in handcuffs, the man inside the home came outside about five minutes later. Deputy Glenn thought that the man was Mr. Dishman but that the man was codefendant Bell. Deputy Glenn said codefendant Bell told the deputies that Mr. Dishman was not inside the home. Deputy Glenn said that Captain Bo Ramsey and Chief Deputy Tommy Meyers arrived at the

scene and that the Defendant provided written consent for the deputies to enter the home to search for Mr. Dishman. Deputy Glenn said that they "cleared" the home "in a tactical setting" with their guns drawn. Deputy Glenn said that after they established Mr. Dishman was not inside, the deputies left the home. Deputy Glenn said that when the deputies returned outside, Investigator Roberts stated that he had seen a bag containing methamphetamine on the floor inside a bedroom. Deputy Glenn said that Investigator Roberts and Investigator Stevens asked the Defendant about the bag and that the Defendant declined to provide her consent to further search the home. Deputy Glenn stated that Investigators Roberts and Stevens left the scene and returned several hours later with a search warrant. Deputy Glenn denied attempting to obtain the Defendant's consent to search the home while the investigators obtained the warrant, although he admitted talking to the Defendant about the cold weather and "pretty much everything" not related to what was inside the home.

On cross-examination, Deputy Glenn testified that he received the information from the White County Sheriff's Office about twenty minutes before going to the Defendant's home and that the only information provided was that Mr. Dishman had outstanding arrest warrants and might have been armed. Deputy Glenn agreed he did not have information showing that anyone was in immediate danger.

A recording from the police dispatch center was played for the trial court, and it was consistent with Deputy Glenn's testimony regarding the deputies' arrival and surrounding the Defendant's home. Deputy Glenn agreed the recording showed that the deputies did not know whether Mr. Dishman lived at the home. Deputy Glenn agreed that the Defendant's consent to search for a person was the basis for entering the home. Deputy Glenn did not dispute the recording showed that at 2:12 p.m. a deputy said, "We got warrants, there might be something in there," that at 2:27 p.m. the deputies surrounded the home, and that at 3:42 p.m. the deputies entered the home. He agreed that approximately one hour elapsed between the deputies' surrounding the home and the Defendant's consent to search.

On redirect examination, Deputy Glenn testified that Deputy Bowles saw someone inside the home who matched the description of Mr. Dishman and that Deputy Bowles relayed this information to everyone at the scene. Deputy Glenn said that the deputies did not "breach the door" afterward because they had information that Mr. Dishman was likely armed. Deputy Glenn stated that they used a loudspeaker to communicate with the people inside the home that the deputies had the home surrounded and that they needed to come out of the home with their hands up. He said that he believed Mr. Dishman "ran back into the [home]." Deputy Glenn said that they did not use force, that the Defendant and codefendant Bell left the home, and that the Defendant consented to the search for

Mr. Dishman. Deputy Glenn did not recall having information that Mr. Dishman was the Defendant's brother. Deputy Glenn said that although Mr. Dishman was not inside the home, the deputies told the Defendant that they smelled and saw methamphetamine and asked for her consent to search the home again. Deputy Glenn said that after the Defendant declined to provide her consent, a search warrant was obtained.

Warren County Detective Steven Carpenter testified that when he arrived at the scene, several deputies were talking to the Defendant. He said that the Defendant did not appear distressed or under duress, although she was nervous. He said that "at some point" the Defendant provided her written consent for the deputies to enter the home to search for Mr. Dishman. He said that when he entered the home, he noticed a "strong chemical smell" and a "fog in the air." He said that Investigator Roberts found a bag of methamphetamine on the floor when he "cleared" a bedroom. Detective Carpenter said that after they knew Mr. Dishman was not inside the home, they left to speak with the Defendant. Detective Carpenter said that they told the Defendant they had found a bag of methamphetamine and asked for her consent to search for drugs but that she did not want the deputies going inside again. Detective Carpenter said that, as a result, a search warrant was obtained, that it took about two or three hours to obtain and return with the warrant, and that methamphetamine was found during the second search.

On cross-examination, Detective Carpenter stated that approximately nine law enforcement officers were at the scene.

Brittany Pack, the Defendant's daughter, testified that, on the day of the incident, she was at the Defendant's home at 3:00 p.m. Ms. Pack said that she received a telephone call from her grandmother, who requested Ms. Pack go to the Defendant's home. Ms. Pack said that when she arrived, four or five sheriff's deputies pointed guns at her, asked who she was, and yelled for her to get out of the car. She said that she was scared and that they made her stand about forty feet from the Defendant. Ms. Pack said that the Defendant looked "very scared" and cried "hysterically." Ms. Pack said that her grandmother arrived after she did and waited with her.

Ms. Pack testified that Mr. Dishman was her uncle and that he was a "really big guy," with red hair and a beard, and weighed 250 pounds. She denied knowing Mr. Dishman had outstanding arrest warrants at the time of the incident. She said that the Defendant was outside the home sitting on the ground when she arrived. She said that she was at the scene when the Defendant provided her consent to search the home for Mr. Dishman. Ms. Pack said that although the deputies did not hurt the Defendant, the deputies "kept on . . . pressuring her and pretty much telling her that they were going in regardless; either she signed it or they were still doing it." Ms. Pack said that the

deputies told the Defendant that the Defendant "might as well go ahead and sign it, that they were going to do that with or without her help." She was unsure whether the deputies were referring to a search warrant.

Judy Dishman, the Defendant's mother and Ms. Pack's grandmother, testified that on the day of the incident she received a call on her way home from work from the Defendant and that Ms. Dishman drove to the Defendant's home. Ms. Dishman said that the Defendant was inside the home when the Defendant called, that the Defendant sounded terrified, and that the Defendant reported the police were outside her home. Ms. Dishman said that when she arrived, she saw ten to fifteen police cars and that the deputies would not allow her to talk to the Defendant. Ms. Dishman said that she stood with her granddaughter and waited. Ms. Dishman said that the Defendant was "very upset" and crying and that two deputies stood with the Defendant.

On cross-examination, Ms. Dishman testified that Mr. Dishman was her stepson and that Mr. Dishman had "a few" pending drug-related charges. She denied that Mr. Dishman was "armed and dangerous" and said that if he were armed, he would not shoot at anyone because Mr. Dishman was "too big of a coward." She agreed the deputies allowed her to stay at the scene as long as she stood near the edge of the road. She agreed the Defendant had been arrested previously and had served time in confinement.

The Defendant testified that on the day of the incident, her friend, codefendant Bell, was at her home. She said that she and he were getting ready to leave to pick up his vehicle when codefendant Bell stated that something was going on outside the home. She said that she looked outside and saw a group of deputies and "guns everywhere." She said that the deputies were crouched behind open car doors with their guns pointed at the home. She said the cars were about ten to fifteen yards from the home. She said that deputies with guns stood around her home, including the backyard. She said that the deputies yelled, that codefendant Bell thought the deputies were looking for someone named "Ronnie," and that the Defendant thought the deputies were looking for Mr. Dishman, who was not at the home. She said that it took time for her to realize what the deputies wanted. She said that she went outside because she did not think she had a choice to remain inside. She said she felt threatened and frightened and thought she "better do something" because she did not know what to do. She said that a panic attack initially prevented her from going outside and that the number of guns caused her to break down. She said about twenty minutes elapsed from when she saw the deputies to when she left the home.

The Defendant testified that she came out of the front door, that the deputies yelled, that they told her to put up her hands and to get on her knees, that she had to "walk" backward on her knees to the nearby woods in the rain and mud, and that all of the deputies pointed their guns at her. She said the deputies "jerked [her] up" when she reached them and that they did not handcuff her until they took her to the jail. She said that the deputies wanted her consent to search the home for Mr. Dishman, that she told the deputies that Mr. Dishman was not at the home, that she offered to call Mr. Dishman, and that the deputies declined. She said that the deputies asked "over and over continuously" for her consent to search the home. When asked what the deputies said to her, she stated that "[p]retty much . . . I felt like I didn't have a choice. They were going to go in my home whether I signed it or not." She said that the deputies told her that they "need [her] to sign these papers" in order for the deputies to enter the home and search for Mr. Dishman. She said that the deputies did not indicate they would leave her property and allow her to return to her home if she refused to consent. She said that she offered to "go and show [Mr. Dishman] wasn't there" but that the deputies declined. She said that she understood the deputies "were absolutely not leaving" until she consented to the search.

On cross-examination, the Defendant testified that when codefendant Bell returned to her home, codefendant Bell said, "Guns are pointed at me." She denied that codefendant Bell said sheriff's deputies had surrounded the home. She said that most of the police cars were unmarked and that "[t]here really wasn't very many identifications on those vehicles out there." She said that she heard the deputies yell for Mr. Dishman "maybe one time" and that she did not hear a lot because she was having a panic attack. She said that she left the home after she recovered from the panic attack in order to tell the deputies that Mr. Dishman was not inside. She said that after the deputies searched her and codefendant Bell did not have any weapons, the deputies began talking to her. She agreed that she was not placed in handcuffs.

The Defendant testified that Mr. Dishman had previously but not recently stayed at her home. She denied that Mr. Dishman ever lived at her home, although he had stayed overnight once. She said that the deputies asked her for consent to search the home for Mr. Dishman and that she provided her written consent "after a lot of coercion." She said that she did not sign the consent form initially and that she did not want to sign it. When asked how the deputies coerced her, she said, "They told me I might as well go ahead and sign it because they're going . . . in anyway." She said that the deputies "led [her] to believe [she] didn't have a choice in the matter," that she was scared to death, and that she did not recall the specific words used by the deputies because she was terrified. She said, though, the deputies told her that if she did not sign the consent form, the deputies could "still get in there anyway," that "[i]t doesn't matter," that she needed

"to go ahead and sign" the form, and that "[t]his is just a form of technicality." She described the deputy who told her this as having dark hair and a short beard and thought his name could have been Ramsey. She said the deputies threatened to obtain a search warrant multiple times. She agreed she signed the consent form.

On redirect examination, the Defendant testified that she was cold and muddy and wanted the deputies to go away. She said that she requested dry clothes but that the deputies denied her request. She said that she told the deputies that someone could enter her home to obtain dry clothes but that the deputies refused and continuously placed the consent form "in [her] face." On recross-examination, the Defendant testified that a deputy did not provide her with a poncho but that a deputy provided codefendant Bell with a poncho. She said, though, that she was so scared that she could have been wrapped in "something plastic."

On rebuttal, Warren County Deputy Steven Carpenter testified that he was not the primary deputy but that Captain Bo Ramsey was the deputy in charge. Deputy Carpenter said that he heard Captain Ramsey explain to the Defendant that the deputies were looking for Mr. Dishman because Mr. Dishman had outstanding arrest warrants in another county. Deputy Carpenter said that Captain Ramsey told the Defendant that the deputies wanted to search the home for Mr. Dishman, that the consent form was read to the Defendant, and that the Defendant signed the form. Deputy Carpenter denied that Captain Ramsey told the Defendant that the deputies were going inside the home regardless of whether she provided her consent. Deputy Carpenter said that Captain Ramsey provided the Defendant with a poncho.

The trial court denied the Defendant's motion to suppress. The court found that the White County Sheriff's Office contacted the Warren County Sheriff's Office with information that White County law enforcement officers believed Mr. Dishman was at the Defendant's home and that Mr. Dishman had outstanding arrest warrants in White County. The court found that codefendant Bell matched the description of Mr. Dishman and that codefendant Bell entered the home without responding to the deputies' first requests "to step out here." The court found that once the deputies saw codefendant Bell, whom they believed to be Mr. Dishman, enter the home, close the door, and not reemerge, the deputies had the authority to seize the property to ensure that codefendant Bell did not go anywhere. The court found that because the deputies had the authority to seize the property, the Defendant's consent was not involuntary and was not objectionable. The court conceded, though, that if the deputies lacked authority to seize the property, the Defendant's consent would have been invalid.

After the suppression hearing, the Defendant pleaded guilty to possession with the intent to deliver methamphetamine and to possession of drug paraphernalia and pursuant to her plea agreement reserved one certified question for appeal:

> Was the consent provided by the Defendant to conduct a warrantless search of her home invalidated by the warrantless seizure and constructive search of her home and curtilage in violation of the Fourth Amendment to the Constitution of the United States of America and Article 1 §7 of the Constitution of the State of Tennessee, or did the officers have exigent circumstances to constructively seize and remain on the property while they obtained consent because there were facts which led them to reasonably believe that an exigent circumstance existed – which was that they possessed an arrest warrant for a person they believed to be inside the residence.

Tennessee Criminal Procedure Rule 37(b)(2)(A) provides that an appeal can be taken from a plea of guilty if the Defendant enters into a plea agreement and explicitly reserves with the consent of the State and the trial court a certified question of law that is dispositive of the case. *See* Tenn. R. Crim. App. 37(b)(2)(A)(i)-(iv); *State v. Armstrong*, 126 S.W.3d 908 (Tenn. 2003). "An issue is dispositive when this court must either affirm the judgment or reverse and dismiss. An issue is never dispositive when we might reverse and remand[.]" *State v. Wilkes*, 684 S.W.2d 663, 667 (Tenn. Crim. App. 1984). Furthermore, the fact that the defendant, the State, and the trial judge have agreed the issue is dispositive does not bind this court. *State v. Preston*, 759 S.W.2d 647, 651 (Tenn. 1988). "[T]he appellate courts must . . . determine if the record on appeal demonstrates how that question is dispositive of the case . . . If the appellate court does not agree that the certified question is dispositive, appellate review should be denied." *Id.* (citing *State v. Jennette*, 706 S.W.2d 614, 615 (Tenn. 1986)); *see State v. Dailey*, 235 S.W.3d 131, 134-5 (Tenn. 2007).

The record reflects that the certified question is not dispositive to the outcome of the case because even if the Defendant's consent to search the home was constitutionally invalid and exigent circumstances did not exist, the evidence would have been inevitably discovered. The deputies received information from another law enforcement agency that Mr. Dishman had multiple outstanding arrest warrants, was armed and dangerous, and was at the Defendant's home. When the deputies arrived at the home, they saw codefendant Bell, who matched the description of Mr. Dishman, on the porch. Codefendant Bell saw the deputies, returned to the home, and did not reemerge. The deputies saw more than one person inside the home. Although the deputies requested that everyone exit the home, they did not exit for approximately thirty minutes.

Based upon this evidence, the deputies had probable cause to believe that Mr. Dishman was inside the Defendant's home. *See Stegald v. United States,* 451 U.S. 204, 214-15 (1981) (concluding that absent exigent circumstances and valid consent, law enforcement officers must obtain a valid search warrant based upon probable cause to search a home). The deputies could have obtained and executed a search warrant without the Defendant's consent in order to search the home for Mr. Dishman, and the drug-related evidence would have been inevitably discovered. *See* T.C.A. §§ 40-6-103, -104; *see also State v. Williams*, 193 S.W.3d 502, 506 (Tenn. 2006) ("Probable cause generally requires reasonable grounds for suspicion, supported by circumstances indicative of an illegal act."); *State v. Patton*, 898 S.W.2d 732, 735 (1994) ("Under [the inevitable discovery] doctrine, illegally obtained evidence is admitted by the court when the evidence offered would have inevitably been discovered by lawful means."). Therefore, the certified question is not dispositive.

In consideration of the foregoing and the record as a whole, we conclude that because the legality of the Defendant's consent does not affect the admissibility of the evidence, the certified question is not dispositive. As a result, we lack jurisdiction and dismiss the appeal.

_____
ROBERT H. MONTGOMERY, JR., JUDGE